**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 06a0745n.06**
**Filed: October 10, 2006**

**Nos. 04-3996 / 04-3997 / 04-4030**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellee, | ) | UNITED STATES DISTRICT |
| | ) | C O U R T   F O R   T H E |
| v. | ) | NORTHERN DISTRICT OF |
| | ) | OHIO |
| GARY HARRIS, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TAMARA SCHWENTKER-HARRIS, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL KOTULA, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| _____ | | |

BEFORE:  MOORE, GRIFFIN, and CUDAHY,[*] Circuit Judges.

GRIFFIN, Circuit Judge.

A Northern District of Ohio jury convicted defendants Gary Harris, Tamara Schwentker-Harris ("Schwentker"), and Michael Kotula of conspiracy to defraud the IRS in violation of 18 U.S.C. § 371.  The jury also convicted Harris on three counts and Kotula on one count of tax evasion in violation of 26 U.S.C. § 7206.  All three defendants appeal.  For the reasons that follow, we affirm Harris's four convictions but remand for resentencing due to *Booker* error and errors in the application of the Sentencing Guidelines.  Regarding Kotula, we affirm his conspiracy conviction but remand for resentencing on that count due to a *Booker* error; we also vacate Kotula's tax-evasion conviction and remand for a new trial on that count alone.  With respect to Schwentker, we affirm her conspiracy conviction but remand for resentencing due to a *Booker* error.

## I.

Harris created a network of businesses called GH Group and, by the 1990s, had a personal net worth of $11 million.  Kotula began working for Harris in 1985 and became his "right-hand man" with managerial authority throughout GH Group.

Harris and Schwentker were romantically involved, and Schwentker bore Harris three children.  In 1993, while working at a restaurant, Schwentker founded T&M Consulting, Inc.

---

[*]The Honorable Richard D. Cudahy, United States Circuit Judge for the Seventh Circuit, sitting by designation.

2

("T&M"). The government alleges that Schwentker had "no significant managerial skills" and that Harris inserted T&M into transactions as a way to give Schwentker money.

The government theorized that Harris "operated through a maze of shell corporations and 'trusts' that he controlled through nominee officers, directors, and owners who were loyal to him." It alleged that this arrangement enabled Harris to keep his name out of the public record and obscure his role in the ventures that generated his wealth.

The government asserted that Harris created sham trusts with the help of Douglas Carpa, a "promoter of abusive offshore 'trusts' and 'untaxing' packages." IRS accountant Fisher testified that Harris's use of such entities created confusion about who was earning income, what tax rate applied, and whether payments were loans, capital contributions, or taxable events.

It also contended that Harris had accounts with Natural Coin Exchange ("NCE"), a warehouse bank operated by the anti-tax Christian Patriot Association ("CPA"). Fisher testified that Harris's use of the NCE broke up the audit trail.

The government further alleged that some Harris entities maintained inadequate records and did not file federal tax returns during the relevant period, and that Harris did not file federal returns. It introduced evidence that, from 1995-2000, Harris's companies grossed $1.8 million in oil and gas receipts and rent which they never reported. The government showed that Harris failed to report $800,000 obtained from a GH amusement park in 1998.

Fisher testified that, although he was unable to calculate exactly how much tax Harris evaded from 1997-2000, he was able to identify unreported income items that Harris earned during that

period and calculate the taxes due:  (1) for 1997, over $375,000 in unreported income, yielding

$106,120 due; (2) for 1998, over $115,000, yielding $33,487 due; and (3) for 1999, over $163,000,

yielding $51,300 due.  Because Fisher lacked a reliable audit trail, he did not include income that

Harris apparently earned from oil and gas operations and the amusement park.

Kotula allegedly schemed to create the appearance that his sale of land to Ashtabula County,

Ohio, qualified for deferred taxation because it occurred under threat of eminent domain.  County

officials testified that they never intended to use eminent domain and that the contract's references

to eminent domain were inserted at Kotula's behest.

In 1996, a federal grand jury charged Harris with tax and RICO offenses.  *US v. Harris*, No.

1:96CR122 (N.D. Ohio).  In 1997, Harris accepted a plea that required him to disclose financial

information, pay $300,000 to settle federal tax obligations for 1990 and earlier, and file returns or

accept IRS-prepared substitute returns for 1991-1996 and pay the liabilities determined for those

years ("the 1997 plea").  The 1997 plea provided, in part,

> ¶ 6(b):  The United States Attorney for the Northern District of Ohio will not bring any other criminal charges against the defendant with respect to conduct alleged in the superseding indictment or other conduct known to [him], as of the date of the execution of this agreement, except as provided in paragraph 6(c) below.  This promise is not binding on any other federal, state, or local governmental entity.

> ¶ 6(c):  If the defendant files income tax returns for the years 1991 through 1996 as provided above in paragraph 5(g)(1), the United States agrees that it will not prosecute him under 26 U.S.C. § 7203 for his prior failure to file such returns and will not use those returns or information in those returns, directly or indirectly, as evidence to prosecute him for any offense of attempting to evade taxes under 26 U.S.C. § 7201 committed prior to the filing of the returns.  The defendant understands, however, that if he willfully falsifies any such return, the United States

will be free to prosecute him for violations of §§ 7201, 7206, or other criminal provisions of Title 26 with respect to that tax year . . . .

The district court sentenced Harris to an agreed-upon four years in prison, which he began serving in August 1998.

In July 2003 a federal grand jury in Northern Ohio returned a five-count indictment. Count one charged all defendants with conspiracy to defraud the IRS and to commit substantive tax offenses, in violation of 18 U.S.C. § 371. Counts two through four charged Harris with evading taxes and failing to file returns for 1996-1999, in violation of 26 U.S.C. § 7201. Count five charged Kotula with tax evasion for 1998. Schwentker was not charged with any substantive offense.

Harris moved to dismiss the indictment, contending that it violated his 1997 plea by charging him with offenses related to 1994-1996; he also moved to strike references to overt acts allegedly occurring in 1994-1996. The district court denied the motions in November 2003.

After hearing argument regarding whether the prior plea was relevant to the element of willfulness in these offenses, the district court prohibited Harris from raising the issue at trial of whether the indictment covered conduct which the 1997 plea obligated the government not to prosecute. The district court ruled, however, that jurors could consider whether Harris believed he had satisfied his tax obligations for 1991-1996 by paying the amounts called for by IRS substitute returns; Harris's possible belief that he had paid all 1991-1996 taxes could bear on whether he had the intent required by count one, conspiracy to defraud.

At trial, the district court let Harris raise the prior plea (1) in his opening statement and (2) while cross-examining the government's first witness. The court, however, disallowed his attempt

5

to cross-examine another IRS witness about the prior plea and his attempt to call the lawyers who negotiated it.

Harris asked for a good faith instruction under *Cheek v. United States*, 498 U.S. 192 (1991). Harris adduced the 2001 prosecutor's letter that he characterizes as stating that his 1991-1996 tax debts had been satisfied. The district court refused the instruction.

A jury found defendants guilty on all charges in February 2004, and the district court denied Harris's motion for judgment of acquittal. The court sentenced Harris to 151 months in prison, Kotula to 60 months, and Schwentker to 15 months. Because of *Blakely v. Washington*, 542 U.S. 296 (2004), the court announced alternate sentences that it would impose if the Guidelines were found to be unconstitutional: ninety-six months in prison for Harris, forty-eight months for Kotula, and no imprisonment and two years probation for Schwentker.

II.

First, on appeal, Harris argues that the instant prosecution was barred by his prior plea agreement:

> [A]fter Harris's release from prison, the same U.S. Attorney's Office prosecuted him again. The first count of the indictment . . . charged a wide-ranging conspiracy . . . between January 1994 and "the date of this Indictment." ( . . . July 8, 2003 . . . .) The focus of the indictment was on tax-related conduct from 1994 through mid-1997, conduct prior to the plea bargain of November 3, 1997 (Overt Acts 21-107), and for tax filing failures while Harris was imprisoned . . . . In effect, the government claimed that it had planted a gigantic loophole in the 1997 agreement and could prosecute Harris notwithstanding [his] reasonable understanding of that deal.

Harris contends that the court should have exercised its equitable power to restore him to the position he would have been in had the government honored its nonprosecution promise. At this point, Harris argues, the remedy is *vacatur* of his convictions and a new trial.

A plea agreement is a contract, *US v. Jones*, 417 F.3d 547, 549 n.1 (6th Cir. 2005), and, in interpreting such an agreement, we apply traditional contract law principles. *Smith v. Stegall*, 385 F.3d 993, 999 (6th Cir. 2004), *cert. denied*, 544 U.S. 1052 (2005). "[P]rimary importance should be placed upon the words of the contract. Unless expressed in some way in the writing, the actual intent of the parties is ineffective, except when it can be made the basis for reformation of the contract." *Id.* Consistent with this principle, the government is held to the literal terms of the writing. *Id.* "Where a defendant fulfills his promise[s] in entering a guilty plea, the prosecution is bound to fulfill any promise made in exchange." *US v. Garcia-Meza*, 315 F.3d 683, 686 (6th Cir. 2003).

The content of a plea is a factual issue that we review for clear error, *US v. Lukse*, 286 F.3d 906, 909 (6th Cir. 2002), but whether a party violated a plea agreement is a legal issue that we review de novo. *US v. Fitch*, 282 F.3d 364, 366 (6th Cir. 2002).

As noted above, ¶ 6(b) of Harris's 1997 plea provided that the U.S. Attorney "will not bring any other criminal charges against the defendant with respect to conduct alleged in the superseding indictment or other conduct known to [him], as of the date of the execution of this agreement, except as provided in paragraph 6(c) . . . ."

In turn, ¶ 6(c) provided that if Harris "files income tax returns for the years 1991 through 1996 as provided above in paragraph 5(g)(1), the United States . . . will not prosecute him under 26 U.S.C. § 7203 for his prior failure to file such returns and will not use those returns or information in those returns, directly or indirectly, as evidence to prosecute him for any offense of attempting to evade taxes under 26 U.S.C. § 7201 committed prior to the filing of the returns." But ¶ 6(c) cautioned that if Harris "willfully falsifies any such return, the United States will be free to prosecute him for violations of §§ 7201, 7206, or other criminal provisions of Title 26 with respect to that tax year, and may use the return as evidence in any such prosecution."

Paragraph 6(c)'s "any such return" refers to the prior sentence's "income tax returns for the years 1991 through 1996 as provided above in paragraph 5(g)(1)." In turn, 5(g)(1) provides: "The defendant will, prior to the date of sentencing, either (1) file personal income tax returns for the years 1991 through 1996 . . . or (2) . . . submit proof . . . that the IRS has prepared substitute returns on his behalf for those years . . . ." It is undisputed that Harris never filed federal tax returns for any of the years 1991-1996, as he could have done under ¶ 5(g)(1). Instead, Harris relied on and accepted the substitute returns prepared by the IRS for those years, the option allowed by ¶ 5(g)(2).

Thus we agree with Harris that he never filed any 1991-1996 returns "as provided in . . . paragraph 5(g)(1)." That means that Harris cannot have "willfully falsified" any return filed "as provided in . . . paragraph 5(g)(1)." This is significant, because Harris's willful falsifications of 1991-1996 returns *that he prepared and filed* was the only situation that the prior plea expressly

8

states will relieve the government of its promise not to prosecute. Therefore, we conclude that the only express exception to the government's nonprosecution promise was not satisfied.

So far we agree with Harris, but no farther. There are *three* situations in which the government could be relieved of its 1997 plea agreement non-prosecution promise: (1) when the defendant's conduct triggers a plea provision expressly stating that the duty not to prosecute is obviated by such conduct, such as ¶ 6(c) of Harris's prior plea; *or* (2) when the defendant violates some other provision of the plea, thereby obviating the government's duty to abide by the agreement at all; *or* (3) when the defendant breaches the duty of good faith and fair dealing that is implied on both parties in every plea agreement.

As discussed above, Harris is correct that the first of these three situations does not apply here. The district court erred in ruling that Harris violated ¶ 6(c) of the prior plea. But Harris's own breach of his promises in the prior plea relieves the government of its duties thereunder. *US v. Wells*, 211 F.3d 988, 995 (6th Cir. 2000) ("[A] defendant who breaches a plea agreement forfeits any right to its enforcement."). Harris breached ¶ 5(f), which required him to give the U.S. Attorney "a complete and accurate financial statement, on government form OBD-500." Harris failed to comply with OBD-500's line 30, which directed him to disclose all transfers of property worth at least $300 in the three years prior to executing the form (July 7, 1998).

The government identifies three transfers Harris was obligated to list on the OBD-500 but did not: (1) 1995, when he caused Austinburg Corp. to sell land and had the title company give $25,000 of the proceeds to T&M; (2) 1995, when he sold the assets of Sharp & Fellows and

deposited $450,000 into his warehouse bank account; and (3) 1997, when he established a non-profit corporation and gave it the assets of the GH amusement park.

Harris does not dispute that the plea obligated him to provide a complete financial statement on Form OBD-500, and that the form instructed him to list all transactions over $300 within the preceding three years. Nor does Harris deny that he caused or authorized the three omitted transactions. Nor does he dispute that each of these three transactions was worth over $300 and occurred during the three years preceding his execution of the form. Therefore, we conclude that Harris breached his plea obligation to provide a complete and accurate financial statement on OBD-500.

That breach relieves the government of its duties under the prior plea. Paragraph 5(j) provides that "[t]he defendant understands that if he breaches any of his promises . . . the government will be released from all of its obligations . . . ." Similarly, at common law "a defendant who breaches a plea agreement forfeits any right to its enforcement." *Wells*, 211 F.3d at 995.

This was not the ground on which the district court ruled that Harris breached. However, it is well-settled that we may affirm for reasons other than those stated by a lower court. *US v. Boumelhem*, 339 F.3d 414, 428 (6th Cir. 2003). We may disregard an alternative argument in support of a lower court's decision if the appellee failed to present that argument below, *id.*, but we have discretion to consider the argument as well. We do so here because the argument that Harris breached ¶ 5(f) of the plea is not fact-intensive (Harris does not dispute the underlying facts) and the record is sufficiently developed to rule on it. *Rakity v. Dillon Cos.*, 302 F.3d 1152, 1166 n.4 (6th Cir.

2002) ("We are free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court.").

Harris asserts that "[t]he completely factual nature of the claim that Mr. Harris's OBD-500 was intentionally and materially incomplete is self evident." Yet he does not dispute that the plea obligated him to provide a complete statement on OBD-500, which instructed him to list all transactions over $300 within the past three years. He does not claim that he was confused by the form's instructions. Nor does Harris dispute that when he filed the form, he knew these omitted transactions were worth over $300 and occurred during the past three years. Therefore, we conclude that Harris breached his plea obligation to provide a complete OBD-500 financial statement.

Harris cites *Pembaur v. City of Cincinnati*, 882 F.2d 1101, 1107 (6th Cir. 1989), for the proposition that "when 'there is no indication in the record that this issue was raised before the district court,' affirmance on an alternate ground that is not a pure question of law is inappropriate." But *Pembaur* did not announce any such rule that only purely legal questions may be considered on appeal if not raised below. *Pembaur* dealt with a rather different situation:

> The County alleges an alternative ground for reversing the district court's decision . . . . The County argues that *Steagald* [U.S. 1981], decided four years after the incident involved in this case, should not have been applied retroactively to provide a basis for compensation for a violation of the fourth amendment.
> * * *
> [T]he retroactive application of *Steagald* would be an intriguing legal issue. * * *
>
> However, Pembaur argues that we are precluded from reversing the district court's decision on these grounds, and we must agree. When the Supreme Court considered this case previously, the . . . retroactivity of *Steagald* was addressed . . . .

11

> [T]he [Supreme] Court is in the best position to determine the import of concessions and arguments made in open court before it. We thus believe it the more prudent course to hold that this issue was conceded before the Supreme Court, at least until that Court speaks more clearly.
>
> Since the Supreme Court has determined that the concession occurred, the County may not now attempt to undo the concession. In general, when an official litigant fails to raise a challenge timely, or concedes an issue, it cannot be raised for the first time this late in the proceedings.

*Pembaur*, 882 F.2d at 1105-06.

Moreover, Harris provides no authority holding that materiality in this or any other context is a purely or predominantly factual issue. On the contrary, precedent leads us to conclude that whether Harris's omission of the transactions represented "material" incompleteness is at most a mixed legal/factual question. *See US ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc.*, 400 F.3d 428, 446 (6th Cir.) (whether false statements were "material" to a false claim to receive money from the government "is a mixed question of law and fact which we review de novo") (citations omitted), *cert. denied sub nom. Winters v. US ex rel. A+ Homecare, Inc.*, – U.S. –, 126 S.Ct. 797 (2005); *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 449 (6th Cir. 2002) (whether ERISA fiduciary's misrepresentation was material is a mixed question of law and fact); *Hammer v. INS*, 195 F.3d 836, 841-42 (6th Cir. 1999) ("The key legal question . . . was whether Hammer had procured his citizenship through the concealment of a material fact . . . ."); *US v. Latouf*, 132 F.3d 320, 330 (6th Cir. 1997) (in perjury prosecution, materiality was a mixed question of law and fact) (citation omitted).

Harris fails to show how these three transactions could be deemed "not material" when the OBD-500 instructions clearly required him to list *all* transactions worth over $300 that took place within the preceding three years. *Cf. Johnson v. US*, 520 U.S. 461, 470 (1997) (evidence that misrepresentation was material was "overwhelming" where the defendant presented no plausible argument that her lying about the source of tens of thousands of dollars which she had used to improve her home was not material to the grand jury investigation, which in part concerned whether the defendant's boyfriend had concealed his drug proceeds as real estate investments).

The government also contends that Harris breached his implied promise of good faith by knowingly providing false information on which the IRS relied in preparing substitute returns. We need not consider this argument; the government is already released from its plea obligations by Harris's breach of his ¶ 5(f) promise to provide the information required by OBD-500.

III.

Next, Harris and Schwentker contend that their convictions should be reversed because the district court erred in admitting testimony by IRS agent Koritala.[1]  They object to Koritala's testimony that discussed (1) the investigation and prosecution of alleged "abusive shelter promoter" Douglas Carpa in 1992, and (2) the contents of taped conversations involving Carpa that were destroyed by the government.  For example, Koritala testified on direct examination as follows:

Q.      How do you know Mr. Carpa?

---

[1]Pursuant to FED. R. APP. P. 28(I), Harris adopts Schwentker's arguments against the admission of agent Koritala's Carpa testimony.  Harris also supplements Schwentker's arguments.

A. [IRS] received information that Mr. Carpa was preparing untaxing packages . . . .

. . . .

Q. And what action did you take to investigate Mr. Carpa?

A. An undercover investigation was initiated. [O]ur undercover agent, whose name was Jim Climber . . . posed as a prospective client for Mr. Carpa . . . .

. . . .

A. He met with him several times. The main occasion where he spent a long time at his house was in August of 1992.

. . . .

Q. What did Mr. Carpa tell Special Agent Climber?

A. Mr. Carpa at the time was at his residence with his first assistant, Joseph Vallencourt. And Mr. Carpa and Mr. Vallencourt explained to Mr. Climber that their other organization had created this series of trust packages wherein a person would no longer have to pay income taxes . . . and went on to explain how it worked.

. . . .

Q. Could you describe the program that Douglas Carpa was referring to?

A. * * * Mr. Carpa . . . would ask the person to file amended tax returns or 1040X's and zero out their income and ask for all taxes paid in to be refunded to them.

[A]fter that . . . they would . . . sign an affidavit saying that they were not a U.S. citizen, that they were [only] a citizen of the state that they lived in. . . .

And after that Mr. Carpa would prepare a series of trusts which he referred to as a wagon wheel type trust, where he would have a wheel of trusts which one would contain your house, one would contain your automobiles, one would contain your bank accounts, one would contain your business, and any other assets. There would be a separate trust. All those trusts would be managed by a management trust and these would all be trusts that were domiciled in the United States. And then there would be a separate trust offshore that would control all these other trusts, and that offshore trust would be controlled by the client.

So Mr. Carpa . . . went on to explain that if the IRS . . . came to seize the assets or seize your income that was in those trusts, they couldn't do it because they would go from trust to trust to trust and finally get to the offshore trust where there would be no information available. [T]he IRS couldn't take anything . . . in those trusts.

14

. . . .

Q. Now, did Mr. Carpa mention whether or not these trusts had any applicability towards payment of future income taxes?

A. He said that . . . you wouldn't have to pay income taxes on that income in the future once he untaxed you.

Q. As a result of this information that you learned . . . what action did you take next?

A. We wrote a probable cause statement and a judge issued . . . search warrants . . . . And we executed those search warrants on, I believe, February 25th, 1993.

. . . .

A. * * * We found hundreds of client files . . . .

. . . .

Q. What was Mr. Carpa's business called? Did it have a name?

A. United Asset Management Trust.

After discussing the files found at Carpa's house, the nature of a wagon-wheel trust, and individuals who allegedly worked for Carpa, agent Koritala testified on cross-exam:

Q. And Mr. Carpa has been in jail since August of 1993, hasn't he?

A. I believe so.

Q. And he's never been convicted of tax evasion?

A. Not that I know of.

Q. And in 1994, when Mr. Harris met with him, either they let him out oh [sic] on a furlough or he didn't meet with Mr. Harris, right?

A. I don't know that he met with Mr. Harris.

. . . .

Q. * * * You would agree with me it is harder for [Carpa] to sell his services if he's openly saying, I'm going to make you a felon?

A. I'll agree with that.

. . . .

Q. He [Carpa] tries to create the impression, the aura that these are appropriate trusts created according to the laws of the United States?

A. Yes.

Q.      Indeed, on the Asset Management Trust it says created pursuant to U.S. public law?

A.      Yes.

Q.      And he takes that document and he has it recorded in the recorder's office in the State of Arizona?

A.      Yes.

Q.      And people accept them as public records?

A.      Yes.

Q.      And when the client gets it back he sees that a government official has recorded it?

A.      Yes.

. . . .

Q.      Now, you said the investigation of Mr. Carpa began in August of 1992?

A.      Actually, that's when the meeting took place.

Q.      I apologize, you are right. It had to start before that otherwise you wouldn't be able to have a meeting with the undercover agent. And there was also an IRS search of Gary Harris's property in September of '92. Do you know anything about that?

A.      No.

Q.      It would be correct to say that other than the fact that they came about a month apart, there was no relationship between those two events?

A.      I don't know that there was one.

Q.      You, as investigating Douglas Carpa, weren't looking at him because of his activities with Mr. Harris, because there weren't any?

A.      I wasn't looking at him. I don't know if there were any or not.

Q.      Whe[n] you looked at Mr. Carpa, it wasn't because of what he had done with Mr. Harris?

A.      No.

Q.      And so far as you know when they looked at Mr. Harris it wasn't what he had done with Mr. Carpa, because he hadn't done it yet?

A.      Correct.

16

Immediately after agent Koritala finished testifying, the district court cautioned the jury that

his testimony was offered against Harris alone:

> That testimony that you just heard was offered to prove . . . Mr. Harris's alleged
> intent in relation to the creation or use of . . . some of the trusts . . . referenced as part
> of this case.
>
> It has not been offered as against . . . Miss Schwentker . . . or Mr. Kotula.  So the
> evidence is to be considered by you for that sole purpose . . . .  Again, as to the
> alleged intent of Mr. Harris in forming these trusts and/or relation to his use of these
> trusts.

First, Harris and Schwenkter contend that the district court erred in admitting the testimony

as a co-conspirator statement under FED. R. EVID. 801(d)(2)(E) because the Carpa conversations

occurred years before the instant conspiracy.  Harris argues,

> it was not the conspiracy charged in the indictment on which the court relied as a
> foundation for the admission of this hearsay, but rather a different and undefined
> conspiracy.  The conspiracy identified as a foundation for admission of the hearsay
> statements was centered on Carpa and his trust-promoting business associates, and
> consisted, it seems, of the trust promoters and perhaps each of their clients, to assist
> those clients in evading taxes.  The indictment conspiracy was among Harris and his
> associates to defraud the U.S. and evade Harris's tax obligations.
> 
> . . . .
> 
> At the time the statements were made, Mr. Harris was not a Carpa client . . . , so the
> statements were not made "during and in furtherance of" any conspiracy which could
> conceivably have existed at some later time between Carpa and Harris to evade
> Harris's taxes.  Nor did the government ever prove that Harris knowingly joined
> whatever conspiracy it was which Carpa's 1992 statements were made to further.
>
> Rather, as the Supreme Court explained in . . . *Kotteakos v. United States*, 328 U.S.
> 750 (1946), when a central figure has criminal dealings with multiple clients, those
> *clients* are not necessarily all in a single conspiracy with one another, unless the facts
> show them to be interdependent and part of a common enterprise.  Thus, a conspiracy
> between a central figure and one client is not the same agreement as that which may
> exist between that same central figure and another client . . . .  Harris *never* became
> a member of the promoters' conspiracy; instead, he later became its customer.

17

Harris reasons that Koritala's Carpa testimony was unfairly prejudicial because it "tied Harris to a broad web of tax evasion, involving multiple off-shore trusts, run by a central figure [Carpa] who had been imprisoned since 1993 (i.e., for over ten years, obviously on very serious charges)." Harris asserts that the prejudice was compounded by the admission of agent Walker's testimony about the CPA, which operated the warehouse bank. Harris says that Walker's testimony consisted of summaries of the investigation to a degree that exceeds permissible "background" and violates the personal-knowledge requirement of FED. R. EVID. 602.

Second, Harris and Schwentker contend that Koritala's Carpa testimony violated their constitutional right of confrontation because there was no showing that Carpa was unavailable and they never had a chance to cross-examine Carpa. The government did not call Carpa as a witness, even though he was a federal prisoner and so readily available.

Third, Harris and Schwentker contend that Koritala's testimony about Carpa should have been excluded under FED. R. EVID. 403 as substantially more prejudicial than probative. Koritala testified about defendants' relationship to certain trusts, but "the government admitted that it had no evidence that 'anyone other than Mr. Harris had a relationship with these trusts.'"

Harris and Schwentker emphasize that, because the government destroyed the Carpa tapes, they could not rebut agent Koritala's testimony or test the accuracy of his recollection of the Carpa conversations. In sum, they contend that the introduction of Koritala's Carpa testimony severely prejudiced them and likely influenced the verdict against them.

Hearsay is a statement, other than one made by the declarant at trial, offered in evidence to prove the truth of the matter asserted, FED. R. EVID. 801(c), and it is presumptively inadmissible, FED. R. EVID. 802. However, certain statements which would be hearsay are simply defined as not hearsay. A statement is not hearsay if "[t]he statement is offered against a party and is . . . (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy. The contents of the statement shall be considered but are not alone sufficient to establish . . . the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered . . . ." FED. R. EVID. 801(d)(2).

The proponent of hearsay must prove that it "fits squarely within a hearsay exception or exclusion." *US v. Kendrick*, 853 F.2d 492, 496 n.3 (6th Cir. 1988). To render Carpa's statements admissible under FED. R. EVID. 801(d)(2)(E), the government had to show that (1) a conspiracy existed that included Carpa and Harris, and (2) Carpa's statements were made in the course of and in furtherance of the same. *US v. Moss*, 9 F.3d 543, 548-49 (6th Cir. 1993). The government must submit non-hearsay evidence – evidence beyond the declarant's statements – to corroborate these contentions. *US v. Payne*, 437 F.3d 540, 544 (6th Cir.), *cert. denied*, – U.S. –, 126 S.Ct. 2909 (2006). In the present case, the district court never found that the government showed that Carpa made the statements in the course of a conspiracy *of which Harris was a member*, and the government did not meet that burden. Even now, the government does not claim that Harris was a member of the conspiracy which Carpa was trying to further with the contested statements. Accordingly, if the government introduced Carpa's statements to prove the truth of the matters

asserted, the statements would be hearsay and it would be an abuse of discretion to admit them under the coconspirator exclusion.

But the government introduced Carpa's statements for a purpose other than proving the truth of the matters asserted. Namely,

> [t]he Carpa statements were important . . . for the fact that Carpa was saying them and that in contracting with the statement maker's organization, defendant demonstrated an anti-tax animus. The government successfully connected Harris with an organization espousing aggressive tax-protestor conduct. His use of the organization's services in his scheme strongly manifested his intent to defeat his obligations under the tax laws, regardless of whether the organization's representations were true.

For example, in *US v. Wilson*, 532 F.2d 641 (8th Cir. 1976), notebooks found in a "heroin house" tended to corroborate the government's version of defendants' drug activities. In response to defendants' contention that the notebooks were hearsay, the court stated:

> we view the declarations in the notebooks as utterances, *used circumstantially*, giving rise to the indirect inference that the apartment was the scene of drug sales and drug related activity. Furthermore . . . *the existence of the notebooks and the fact of these entries* served to corroborate [a government witness's testimony]. It is the fact that the statements were written, and not the truth of the statements, which was relevant.

*Id.* at 646 (citations & nn. omitted).

The government properly introduced such evidence because a jury may consider a defendant's tax-protestor activities and anti-tax animus as bearing on whether his noncompliance with the tax laws was willful. *US v. Grosshans*, 821 F.2d 1247, 1253 (6th Cir. 1987). Introduced for this purpose, the Carpa statements were not hearsay. Thus, the government had no burden to show that the statements qualified for an exception to the rule prohibiting hearsay.

Nonetheless, the fact that Carpa's statements were admissible as nonhearsay does not change the fact that they were admitted on a different and wrong basis (as coconspirator statements). Because the district court erroneously ruled that Carpa's statements were hearsay, it had no occasion to instruct the jury to consider the statements only for their non-hearsay purpose.

Absent such a limiting instruction, we cannot be confident that the jury considered the statements only for the permissible purpose. *Cf. US v. Perry*, 438 F.3d 642, 648-49 (6th Cir.) (although district court did not abuse discretion in finding that evidence was not substantially more prejudicial than probative under Rule 403, "the court should nonetheless issue a limiting instruction establishing the basis for the inclusion of the Rule 404(b) evidence"), *cert. denied*, – U.S. –, 126 S.Ct. 2045 (2006).

The Supreme Court encountered a somewhat similar situation in *Shepard v. US*, stating:

> Here the course of the trial put the defendant off his guard. The testimony was received by the trial judge and offered by the Government with the plain understanding that it was to be used for an illegitimate purpose, gravely prejudicial. A trial becomes unfair if testimony thus accepted may be used in an appellate court as though admitted for a different purpose, unavowed and unsuspected. Such at all events is the result when the purpose in reserve is so obscure and artificial that it would be unlikely to occur to the minds of uninstructed jurors, and even if it did, would be swallowed up and lost in the one that was disclosed.

290 U.S. 96, 103 (1933), *quoted in US v. Williams*, 837 F.2d 1009, 1012-13 (11th Cir. 1988).

The Supreme Court's *Shepard* decision, however,

> does not necessarily prohibit the courts of appeals from affirming the admission of evidence on grounds not advanced below under all circumstances. As the above-quoted *Shepard* excerpt indicates, the basic unfairness in that case derived from the government's attempt to justify the admission of Mrs. Shepard's statement on a theory wholly unrelated to the ground advanced at trial.

> The Second and Third Circuits have held that the *Shepard* rationale does not apply when the evidentiary grounds relied on by the government at trial and on appeal serve the same purpose. In *United States v. Rosenstein*, 474 F.2d 705 (2d Cir. 1973), the government introduced documents at trial under the business-records exception to the hearsay rule. The Second Circuit concluded that the documents were not properly admitted under that exception . . . . Nonetheless, the Second Circuit held that the documents could have been admitted as admissions of the defendant. *Shepard* did not require reversal, for both justifications for the admission of the documents served the same purpose, namely the establishment of the truth of the matter asserted. The basic unfairness in *Shepard*, where the government advanced on appeal a theory wholly unlike the one presented to the trial court, was therefore not present in *Rosenstein*.

*Williams*, 837 F.2d at 1013.

Here, as in *Shepard*, the government advances on appeal a theory for the admission of Carpa's statements (verbal acts that are not hearsay) that is wholly unlike the one considered by the district court (coconspirator statements excepted from the hearsay rule). The two grounds for admission do *not* serve the same purpose; the coconspirator exception allows statements to be introduced as proof of the matters asserted, while the verbal-acts doctrine does not. *See, e.g., Preferred Props., Inc. v. Indian River Estates, Inc.*, 276 F.3d 790, 798 n.5 (6th Cir. 2002). Therefore, the admission of Koritala's Carpa testimony statements was error of the sort condemned in *Shepard.*

The question is whether this error warrants vacatur of Harris's convictions. We may treat the failure to give a limiting instruction regarding Koritala's Carpa testimony as harmless error if "it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *US v. Baldwin*, 418 F.3d 575, 582 (6th Cir. 2005) (citation omitted). We hold that the

error was harmless here because there was "overwhelming evidence of guilt beyond the erroneously admitted testimony." *Id.* We note that Harris has not challenged the sufficiency of the evidence.

Harris also contends that the admission of Koritala's Carpa testimony violated his Sixth Amendment right to confront the witnesses against him. To evaluate this argument, we first note the difference between testimonial and non-testimonial statements. *See Davis v. Washington*, 547 U.S. –, 126 S.Ct. 2266, 165 L.Ed. 2d 224, 236-37 (2006). Previously, the Supreme Court declined to comprehensively define "testimonial," but testimonial statements include "at a minimum . . . prior testimony at a preliminary hearing, before a grand jury, or at a former trial; [and] police interrogations." *Crawford v. Washington*, 541 U.S. 36, 68 (2004). "Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.*

But we need not decide whether Carpa's statements were testimonial. They would not implicate the Confrontation Clause even if they were:

> The admission of a testimonial statement in and of itself is not enough to trigger a violation of the Confrontation Clause. Instead, the statement must be used as hearsay. [T]he Confrontation Clause does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.

*US v. Pugh*, 405 F.3d 390, 399 (6th Cir. 2005) (quoting *US v. Cromer*, 389 F.3d 662, 676 (6th Cir. 2004)). As discussed above, Carpa's statements were not used as hearsay, so their admission (through Koritala's testimony) does not implicate the Confrontation Clause. *Cromer*, 389 F.3d at 676 ("Any out-of-court statements . . . explain[ed] how certain events came to pass or why the officers took the actions they did. Because the statements were not offered to establish the truth of

23

the matter asserted, the Confrontation Clause does not apply."); *accord US v. Hansen*, 434 F.3d 92, 100 (1st Cir.), *cert. denied*, – U.S. –, – S.Ct. –, 2006 WL 1887252 (Oct. 2, 2006).

That leaves the question of the probative value and prejudicial impact of Carpa's statements. In this case, however, the district court did not perform the correct Rule 403 analysis. The district court considered the probative value and prejudicial impact of the Carpa statements *when introduced to prove their truth*. But it did not consider the value and impact of the Carpa statements *when introduced for the non-hearsay purpose of showing that Harris was a client of someone who made statements suggesting an intent to help clients evade taxes*.

Therefore, Harris contends, the case must be remanded for the district court to make this Rule 403 determination. We disagree. Under the circumstances, the interest in judicial economy, combined with the fact that this is not a close question, lead us to conduct the Rule 403 balancing. *See US v. Schiff*, 612 F.2d 73, 80 (2d Cir. 1979) ("[W]e have viewed the evidence . . . with our own eyes, and can judge the likely prejudice resulting from it as well as the trial judge."); *cf. US v. Sriyuth*, 98 F.3d 739, 748 n.15 (3d Cir. 1996) ("[W]e must make this determination in the first instance as the district court record is devoid of any references to a Rule 403 analysis.").

When conducting a Rule 403 balancing, we view the evidence in the light most favorable to the prosecution, maximizing the probative value of the evidence and minimizing its potential prejudice to the defendant. *US v. Logan*, 250 F.3d 350, 368 (6th Cir. 2001). "Moreover, the prejudice to be weighed is the *unfair* prejudice caused by admission of the evidence. Evidence that

24

is prejudicial only in the sense that it paints the defendant in a bad light is not unfairly prejudicial . . . ." *US v. Sanders*, 95 F.3d 449, 453 (6th Cir. 1996).

As discussed above, agent Koritala's Carpa testimony was highly probative of Harris's state of mind. The Carpa statements were important for the very fact that Carpa was saying them and that, in contracting with the organization, Harris demonstrated an anti-tax animus and perhaps a desire to enlist the warehouse bank's aid in evading taxes. The First Amendment recognizes Harris's natural right to express anti-tax sentiments, but it does not prevent a reasonable jury from inferring intent to evade in part from Harris's association with tax-protesting and arguably tax-evading persons (Carpa) and organizations (CPA) and his use of their services, which were touted precisely for their utility in thwarting tax investigations. Conversely, there was a risk that the jury would impermissibly reason that, because Harris associated with tax evaders, he must be an evader too.

On balance, we conclude that the significant probative value of Koritala's Carpa testimony was not "substantially outweighed" by the risk of "unfair" prejudice to Harris or his codefendants.

IV.

Harris also contends that agent Walker's testimony summarizing the investigation should have been excluded because Walker had no personal knowledge of the events he described: "That this Court has approved carefully limited presentations of 'background' evidence, *see US v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000), does not authorize wholesale disregard of the personal knowledge requirement under the Rules."

25

Harris points to four offending statements by agent Walker as examples: (1) "during the investigation we found this organization [CPA] was created to – was an anti-tax organization that its whole purpose is to help its client vanish from the system"; (2) "[t]hey wanted to make sure that it was very difficult for the IRS and any other government entity to come in and identify their clients"; (3) "[w]hat they did here was to eliminate paper and try to eliminate a paper trail, as they always say"; and (4) when CPA literature cited "our right to associate, to redress the government under the First Amendment", the CPA actually meant that "they are not going to cooperate with the Internal Revenue Service. In the event they get like a summons or levy . . . , they will not respond, or they will respond with no money available."

Harris reasons that, because the government presented evidence that he has accounts at the CPA bank, he was prejudiced by Walker's testimony describing the CPA pejoratively.

Federal Rule of Evidence 602 provides,

> A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness' own testimony. This rule is subject to the provisions of rule 703, relating to opinion testimony by expert witnesses.

Personal knowledge may be proved by the witness's own testimony, but he "must still set forth a factual basis for his claim of personal knowledge . . . ." *Hilgraeve, Inc. v. Symantec Corp.*, 271 F. Supp. 2d 964, 974 (E.D. Mich. 2003) (citing *Davis v. City of Chicago*, 841 F.2d 186, 189 (7th Cir. 1988)).

26

Nonetheless, the threshold for admitting testimony under Rule 602 is low. *US v. Franklin*, 415 F.3d 537, 549 (6th Cir. 2005). Testimony should not be excluded for lack of personal knowledge "unless no reasonable juror could believe that the witness had the ability and opportunity to perceive the event that he testifies about." *Id.*

If Harris had lodged a sufficient Rule 602 objection to agent Walker's testimony, we would review the decision not to exclude the testimony under Rule 602 only for abuse of discretion. *Tisdale v. Fed. Express Corp.*, 415 F.3d 516, 535-36 (6th Cir. 2005).

But Harris did not make a specific Rule 602 objection to Walker's testimony. Before Walker testified, the government explained to the district court that Walker's testimony would be based on documentary evidence linking Harris to the warehouse bank that was seized during a search of CPA offices. The government further explained that Walker would testify about a CPA brochure seized during a search of Harris's storage facility. Walker would testify about the nature of the CPA based on his familiarity with the group. Harris's counsel stated only that he would object if Walker were to "go on about the organization itself." The court let Walker testify and stated that, if any issue arose "with regard to purported co-conspirator statements or anything of that nature," it would "deal with it separately." As the government points out, Harris's counsel never objected to or moved to strike any specific testimony of Walker.

Accordingly, we review the admission of agent Walker's testimony for plain error only. To establish plain error, Harris must show that an error (1) occurred, (2) was plain, i.e. obvious or clear, (3) affected his substantial rights, and (4) seriously affected the fairness, integrity, or public

reputation of the judicial proceedings. *US v. Abboud*, 438 F.3d 554, 583 (6th Cir. 2006), *pet. cert. filed*, 75 U.S.L.W. 3106 (U.S. Sept. 7, 2006) (No. 06-348).

Even if Walker lacked sufficient personal knowledge to testify to the matters he discussed., it was not *plain* error to admit his testimony because it did not affect Harris's substantial rights.

In this regard, Walker's testimony about the CPA's philosophy and the purpose of its warehouse bank (helping clients vanish from the tax system, concealing their identities, eliminating paper trails that could aid IRS investigation) merely covered the same ground as a CPA brochure that was found in Harris's briefcase and admitted into evidence without objection. The CPA brochure touted the merits of the NCE warehouse bank as follows:

> If you have control over the name of the payee who appears upon your checks and money orders, the ideal way to drop out of sight economically is to have the checks and money orders made payable to NCE, CPA instead of yourself or your business. This eliminates completely the paper trail which normally follows you around via the Federal Reserve Banking System. . . .

> The Exchange will pay bills for you at your direction. . . . No method of payment establishes a paper trail which is traceable back to you.

Even without Walker's testimony regarding the CPA and its bank, the government introduced ample other evidence tending to show that the bank was designed to evade taxes, and that Harris had dealings with the bank. *See US v. Brannon*, No. 92-5002, 974 F.2d 1339, 1992 WL 217436, at *1 (6th Cir. Sept. 8, 1992) (even if the DEA agent lacked personal knowledge of the events he described from surveillance of the suspected meth lab, admission of testimony was harmless because there was ample other evidence that defendant went to the warehouse that day and was guilty of the charged offenses).

28

V.

Next, Harris claims that the jury instructions on good faith and willfulness were erroneous and warrant a new trial. We disagree.

In federal criminal tax cases, the government must prove that the defendant acted willfully. *US v. Cockett*, 330 F.3d 706, 712 (6th Cir. 2003) (citing *Cheek v. US*, 498 U.S. 192, 200 (1991)). Due to the complexity of federal tax law, a person may not be convicted for failing to adhere to a tax law unless he was aware of the law and consciously disregarded it. *Cheek*, 498 U.S. at 199-200.

The Supreme Court rejects the notion that a good-faith misunderstanding of the law or a good-faith belief that one is not violating the law must be objectively reasonable if it is to negate willfulness. *Id.* at 201. If a defendant believed in good faith that he was not violating the tax law, he cannot be convicted of any crime requiring willfulness or intent, even if his belief was unreasonable. The trier of fact (here, the jury) determines whether a defendant held such a good-faith belief. *Id.* at 203.

Harris contends that "[t]he Court's minimal instructions[2] on specific intent did not cover the

---

[2]At the close of trial, the district court instructed the jury, in pertinent part:

For you to find any one of the defendants guilty of the conspiracy charge, the government must prove each and every one of the following elements beyond a reasonable doubt:

. . . .

[On count one, 18 U.S.C. § 371] What the government must prove is that a defendant knew the conspiracy's main purpose, and that he or she voluntarily joined it intending to help advance or achieve its goals. This is essential.

. . . .

The phrase "attempts in any manner to evade or defeat any tax" involves two things.

29

issue adequately, in light of the special meaning given . . . to the willfulness requirement in criminal

tax cases." Harris elaborates,

> The indictment charged . . . Harris with an ongoing conspiracy . . . to evade both assessment and collection of his federal income taxes, including taxes due for 1994, 1995 and 1996. He based his defense at trial, in this respect, on the issue of "good faith" – an honest belief that he had resolved his tax liabilities for those years. If so, his conduct could not have been intended to evade or defeat those taxes or to defraud the United States in that regard. Concomitantly, if he engaged in the conduct in good faith, he did not act "willfully" in the sense used in criminal tax law. . . . .

> In this case, the charge as a whole eviscerated the effectiveness of the court's attempt to instruct on the defense theory with respect to key contested elements and all but eliminated the intent question from the jury's consideration. . . . .

---

> First, the formation of an intent to evade or defeat a tax; and second, willfully performing some act to accomplish the intent to evade or defeat that tax.
> . . . .
> In order to sustain its burden of proof for the crimes of attempted income tax evasion as charged in Counts 1, 2 – I'm sorry, Counts 2, 3, 4 and 5 of the indictment, the government must prove beyond a reasonable doubt that Defendant Gary Harris . . . acted willfully.

> To act willfully means to act voluntarily and deliberately and intending to violate a known legal duty. Negligent conduct is not sufficient to constitute willfulness.
> . . . .
> Defendant Gary Harris' position is that the government's contention that there was a conspiracy to evade taxes is simply not supported by the evidence. . . . Harris believes that there has been no testimony or evidence of any agreement among the defendants to do anything unlawful. As to the issue of intent, Defendant Gary Harris submits that he relied on the plea agreement he made in 1997 with respect to issues involving the years 1994, 1995 and 1996.
> . . . .
> You have heard some evidence related to Defendant Gary Harris' 1997 plea agreement . . . . This plea agreement in no way prevents the United States from proceeding with the charges alleged in this indictment. You may, however, consider the facts and circumstances surrounding the plea agreement, financial statement, and income affidavit in evaluating his intent.

> In addition, [Schwentker] properly requested that the trial court instruct the jury on the two specific intent elements of the offense of conspiracy under 18 U.S.C. § 371, the intent to agree and the intent to effectuate the charged objectives of the conspiracy. . . . . In particular, where conspiracy under § 371 is charged in a tax case there is a special knowledge element: the statute does require the government to show that they knew of the liability for taxes.
>
> . . . .
>
> If properly instructed, the jury could readily have believed (or at least entertained a reasonable doubt whether) Harris believed in good faith that his November 1997 plea had resolved all tax issues prior to that date. The charges that he continued to commit tax evasion for the years 1997, 1998 and 1999 while serving his prison sentence depended on the jury's assessment of Harris's good faith in believing that he could postpone filing his returns for those years.

Similarly, Harris contends that "[t]he overriding problem with the instructions in this case is their failure to convey that if Harris believed all of his tax problems were resolved by the plea, he could not have conspired to defraud the IRS with respect to those years . . . ."

At the charging conference, Schwentker requested a good-faith instruction, claiming that she believed that the returns she filed were accurate, and Kotula requested such an instruction, claiming that he relied in good faith on Harris's accountants and lawyers.

Harris and Schwentker objected at trial to the jury instructions on *mens rea*. We review a properly preserved objection to a jury instruction by determining "whether the charge, taken as a whole, fairly and adequately submits the issues and applicable law to the jury." *US v. Blood*, 435 F.3d 612, 623 (6th Cir. 2006). We may vacate a conviction due to faulty jury instructions only if the instructions, viewed as a whole, "were confusing, misleading, or prejudicial." *Id.* Although an instruction alleged to be faulty on a question of law is reviewed de novo, "the failure to provide a requested jury instruction . . . is reviewed for abuse of discretion." *Id.*

31

A district court must instruct the jury on the defendant's theory of the case "'if the theory has some support in the evidence and the law,' but not where the instruction is 'based on speculation.'" *Blood*, 435 F.3d at 623 (quoting *US v. Morgan*, 216 F.3d 557, 566 (6th Cir. 2000)). We are mindful that "even a facially correct instruction may, in light of record proof, the totality of the jury charges, or other circumstances of the case, be incomplete, misleading, confusing, or otherwise prejudicial." *US v. Carney*, 387 F.3d 436, 448-49 (6th Cir. 2004). Nonetheless, when reviewing a decision not to give a requested instruction, we reverse only if the proposed instruction is correct, is not substantially covered by the charge actually given, "and is so important that failure to give it substantially impairs the defense." *Blood*, 435 F.3d at 623-24.[3]

Significantly, reversal is not warranted whenever reasonable jurors *could have* interpreted the instructions given in a way that led them to convict, even though the jurors found that defendants had a good-faith belief that they were complying with the tax laws. As we explained recently,

> [i]n *Cage* [*v. Louisiana*, 498 U.S. 39 (1990)], the Supreme Court held that the instruction at issue violated the Constitution because a reasonable juror "could have" interpreted the instruction at issue to permit a finding of guilt without proof of guilt beyond a reasonable doubt. Since then, however, in *Estelle v. McGuire*, 502 U.S. 62 . . . (1991), the Supreme Court clarified that the proper inquiry is not whether the instruction "could have" been unconstitutionally interpreted, but whether there is a *reasonable likelihood* that the jury did so interpret it . . . .

*Perry*, 438 F.3d at 651 (internal citation omitted) (emphasis added).

---

[3]An omitted instruction is less likely to warrant reversal than an improper one because an omitted instruction "is not as prejudicial as a misstatement of the law." *US v. Jamieson*, 427 F.3d 394, 414 (6th Cir. 2005), *cert. denied*, – U.S. –, 126 S.Ct. 2909 (2006).

32

Harris does not meet the second criterion for reversal due to an omitted jury instruction. We determine that the instruction given substantially covered the substance of the requested good faith instruction. The requested instructions arguably spelled out in more detail and focused the jury's attention more on the rule that good faith can negate willfulness or specific intent. The fact that the given instruction is less detailed or forceful than that requested, however, does not change the fact that the former substantially covered the essential principle.

For example, in *US v. Alston*, 375 F.3d 408 (6th Cir. 2004), the court gave lengthy instructions on credibility, including the general directive,

> ask yourself if the witness had any relationship to the government or the defendant, or anything to gain or lose from the case, that might influence the witness's testimony. Ask yourself if the witness had any bias or prejudice or reason for testifying that might cause the witness to lie or to slant their testimony . . . .

*Id.* at 412. Alston contended that the district court erred by not instructing the jury that it should not view police as more credible due to their status. *Id.* at 411. We rejected Alston's argument, stating,

> We believe the above instruction invites jurors to think about whether witnesses, such as the officers, may be biased because of their relationship with the government. Ms. Alston's concern that the officers' testimony would be given greater deference because of their status was adequately addressed by this instruction and other jury instructions as a whole, and the district court did not abuse its discretion.

*Id.* at 412. Likewise here, the instruction given correctly stated the applicable law and it substantially covered the same ground as the proposed instructions did. Indeed, this court recently upheld a very similar instruction on willfulness in a federal tax prosecution:

> Tarwater also argues that the district court erred by not giving a good faith instruction
> . . . .

33

> [T]he instructions, viewed as a whole, adequately encompassed his theory of defense. The district court instructed the jury on the specific intent required for a conviction for filing false tax returns by stating:
>
>> The word "wilfully," as used in this statute, means a voluntary, intentional violation of a known legal duty. In other words, the defendant must have acted voluntarily and intentionally and with the specific intent to do something he knew the law prohibited, that is to say, with intent either to disobey or to disregard the law. Negligent conduct is not sufficient to constitute wilfulness.
>
> The jury's conclusion that Tarwater acted willfully would necessarily negate any possibility of "good faith" in filing false tax returns.

*US v. Tarwater*, 308 F.3d 494, 509-10 (6th Cir. 2002) (citing *US v. Pomponio*, 429 U.S. 10, 12-13 (1976) (where the court instructs that "willful" in 26 U.S.C. § 7206 means a "voluntary, intentional violation of a known legal duty . . . [a]n additional instruction on good faith [i]s unnecessary.")).

Accordingly, we need not address the other criteria for reversal due to an omitted instruction: whether the proposed instruction correctly stated the law and whether its absence substantially impaired the defense. *See Blood*, 435 F.3d at 623-24.

In sum, the instructions adequately advised the jury of the *mens rea* element. By convicting Harris *et al.* of conspiracy to defraud the IRS (and by convicting Harris and Kotula of tax evasion), the jury necessarily found they did not have a good-faith belief that they were not violating the tax laws. In Harris's case, the jury necessarily found that he did not have a good-faith belief that (1) he did not owe tax for 1994-1996 beyond the amounts paid for those years under the 1997 plea, and (2) incarceration relieved him of the duty to file timely returns for later years. *US v. Iskander*, 407 F.3d 232, 241 (4th Cir. 2005) ("[T]he jury found him guilty on Counts . . . which state that the defendant

34

'did willfully attempt to evade and defeat a large part of the income tax due.' In other words, the jury found beyond a reasonable doubt that Iskander did not have a subjective belief, irrational or otherwise, that he was not violating the law when he took cash . . . and did not declare" it).

As discussed above, it was error not to instruct the jury to consider agent Koritala's Carpa testimony only for the non-hearsay purpose (to show that the person whom Harris consulted promoted measures to evade taxes) rather than the hearsay purpose (to show that Carpa actually used such measures with the intent of evading taxes, on behalf of Harris or otherwise). In addition, under Rule 602, it may have been error to admit agent Walker's testimony because he lacked personal knowledge of the investigations which he described. Although each of these errors was harmless, we must consider whether they cumulatively warrant vacatur of Harris's convictions. *US v. Parker*, 997 F.2d 219, 221 (6th Cir. 1993). We determine that they do not.

## VI.

### A.

In regard to his sentence, Harris argues that the district court overstated the amount of tax loss in two respects. First, Harris argues it applied the Guidelines' "default percentage" rule to gross receipts, when the guideline refers to gross income. Harris raised this argument in his sentencing memorandum:

> [M]ost of the transactions generating income [and included on the government's "tax loss" exhibit] involved the sale of real estate which had been purchased by the defendant or one of the entities which he managed. Absolutely no adjustment in the Government's income figure has been made for the cost of these properties. . . . [T]he tax loss [computation] cannot simply ignore the obvious impact [that] real estate's cost basis would have on that matter.

Harris renewed this argument at sentencing.

Second, Harris argues the district court improperly included allegedly unpaid state, local, and FICA taxes, when the government never showed that his nonpayment of those taxes was criminal (as required by this court's interpretation of U.S.S.G. § 1B1.3) and the district court never so found. Harris raised this argument in his sentencing memorandum.

The government provides no meaningful opposition to the tax-loss arguments, stating only,

> We do not agree that the District Court . . . erred in calculating . . . Harris's tax loss or in applying . . . an obstruction enhancement to Harris. But since the District Court conducted the sentencing proceedings below without the benefit of the Supreme Court's guidance in *Booker*, this court should order new sentencing hearings.

The government may have expected us to remand for resentencing under *Booker* and ignore the other assignments of sentencing error. But "[w]hile resentencing is required under *Booker*, we consider the remaining claims because the district court will need to consider the correct Guidelines-recommended sentence . . . on remand." *US v. Yagar*, 404 F.3d 967, 970 (6th Cir. 2005).

When a defendant is convicted of evasion, willful failure to file or supply information or pay a tax, or for filing a false document, the base offense level is determined by calculating the tax loss under U.S.S.G. § 2T1.1 and consulting the conversion table at § 2T1.4. The guideline instructs:

> (1) If the offense involved tax evasion . . . , the tax loss is the total amount of loss that was the object of the offense . . . .
>
> Notes:
> (A) If the offense involved filing a tax return in which gross income was underreported, the tax loss shall be treated as equal to 28% of the unreported gross income (34% if the taxpayer is a corporation) plus 100% of any false credits claimed against tax, unless a more accurate determination of the tax loss can be made.
> . . . .

36

(2) If the offense involved failure to file a tax return, the tax loss is the amount of tax that the taxpayer owed and did not pay.

Notes**:**
(A) *If the offense involved failure to file a tax return, the tax loss shall be treated as equal to 20% of the gross income* (25% if the taxpayer is a corporation) less any tax withheld or otherwise paid, *unless a more accurate determination of the tax loss can be made*.

U.S.S.G. § 2T1.1(c) (emphasis added). These presumptions apply unless the parties provide sufficient information for a more accurate assessment of tax loss. *Id.*, App. Note 1.

Note 6 states that, for tax-loss estimates under this guideline, "gross income" has the meaning given by 26 U.S.C. § 61, which includes compensation for services, fees, commissions, benefits, gross income from business, gains from dealings in property, interest, rents, royalties, and dividends.

Harris is correct that the district court erred in using gross receipts rather than gross income in applying § 2T1.1(c). Unless a statute or regulation provides otherwise, gross receipts are not ordinarily understood to be equivalent to gross income. *See, e.g., Colony, Inc. v. CIR*, 357 U.S. 28, 36-37 (1958) (taxpayer reported gross *receipts* from sale of land but overstated its basis in the land, resulting in an understatement of gross *income*); *Ohio Periodical Dists., Inc. v. CIR*, 105 F.3d 322, 327 (6th Cir. 1997) (Kennedy, J., dissenting) ("26 U.S.C. § 458(e) . . . confirms that a taxpayer may exclude from gross *income* . . . the gross *receipts* attributable to its qualified sales.") (emphasis added).

At sentencing, the government stated, "This 20 percent figure contemplates the business deductions, the business expenses and certainly there were numerous business expenses in this case. . . . . But, Your Honor, the point is that that 20 percent figure takes that into consideration." This

37

statement is untenable. When a provision directs the court to use twenty percent of gross *income*, by definition the twenty percent has *not* already "taken into consideration" the taxpayer's expenses. Only by subtracting expenses from gross receipts can the court arrive at gross income – and it is a percentage of that latter number that must be used in the § 2T1 calculation.

The district court did not determine what portion of gross receipts represented gross income. That is error that requires vacatur of Harris's sentence and resentencing with a calculation of tax loss based on a percentage of gross income, not gross receipts. The government must provide a detailed explanation of the expenses it deducted from gross receipts to arrive at its gross *income* figure.

Harris also contends that the district court erred by including unpaid state, local, and FICA taxes in the tax loss. We agree. Harris's sentencing memo contended that these amounts were not charged in the indictment and did not constitute "relevant conduct." He contends that relevant conduct cannot include (1) losses from the violation of non-federal tax law, and (2) losses from conduct not shown to have been criminal (nonpayment of state and local taxes). The latter argument prevails.

U.S.S.G. § 1B1.3(a), Relevant Conduct (Factors that Determine the Guideline Range), provides that, unless otherwise specified, the base offense level shall be determined based on:

> (1) (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity that occurred during

> the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;
>
> * * *
>
> (3) all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and
>
> (4) any other information specified in the applicable guideline.

The Commission's notes to the tax-loss guideline further provide, "In determining the tax loss attributable to the offense (*see* § 1B1.3(a)(2)), all conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated." U.S.S.G. § 2T1.1, App. Note 2. The Commission defines a common scheme as two or more offenses "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*." U.S.S.G. § 1B1.3, App. N. 9A. It defines a common course of conduct as two or more offenses "sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." *Id.*, App. N. 9B. Moreover, acts or omissions falling within the § 1B1.3 definition are relevant conduct even if the defendant was not prosecuted – and even if he was acquitted of charges involving those acts or omissions or could no longer be prosecuted due to the statute of limitations. *US v. Pierce*, 17 F.3d 146, 150 (6th Cir. 1994).

This court has held that "a district court may not include conduct in its sentencing calculation pursuant to § 1B1.3(a)(2) unless the conduct at issue amounts to an offense for which a criminal defendant could potentially be incarcerated." *US v. Shafer*, 199 F.3d 826, 831 (6th Cir. 1999). *Shafer*'s facts provide a useful illustration of how this rule works:

> The relevant conduct at issue in the present case involves Shafer's failure to pay his workers overtime wages for their work on non-government projects in violation of the Fair Labor Standards Act . . . . * * * [T]he FLSA specifically states that:
>
> * * * No person shall be imprisoned under this subsection except for an offense committed after the conviction of such person for a prior offense under this subsection.
>
> Pursuant to this statute, Shafer could have received a fine if he had actually been charged with and convicted of the FLSA violations. Because Shafer would not have received any prison time had he been criminally prosecuted for the FLSA violations, his failure to pay overtime wages for work on the non-government contracts is conduct that should not have been included in his base offense level . . . .

*Shafer*, 199 F.3d at 831.

Here, the district court made no finding as to whether Harris's nonpayment of state, local, and FICA taxes "amounts to an offense for which a criminal defendant could potentially be incarcerated," *Shafer*, 199 F.3d at 831, so it erred by including that conduct as relevant conduct for tax-loss purposes. On remand, the district court must decide this issue in the first instance.

### B.

The district court enhanced Harris by three offense levels for obstruction of justice because it found that he submitted a false income affidavit on which the IRS relied in preparing substitute returns for the years covered by the 1997 plea. Harris contends that this was error because his submission of the affidavit did not occur "during the investigation, prosecution or sentencing of the instant offense[s] of conviction" as required by U.S.S.G. § 3C1.1. Harris reasons:

> [T]he allegedly "obstructive" behavior was part of the charged offense conduct . . . Overt Act 109 in the indictment. Because the conduct for which the district court penalized Harris occurred as part of the *commission* of the offense, and not during the

investigation or prosecution of that offense, it did not fit [§ 3C1.1]'s specific limitation. . . . .

Harris filed the affidavit . . . in March 1998, between the entry of his guilty plea in the prior prosecution and the sentencing in that case, as part of his fulfillment of his obligations under the plea agreement in that matter. If the filing of the "false" affidavit "obstructed" any proceeding . . . it was the sentencing in the prior case, not the investigation or prosecution of the instant case.

A § 3C1.1 enhancement is appropriate if the defendant obstructed "the investigation, prosecution or sentencing of the instant offense of conviction." U.S.S.G. § 3C1.1. To see if Harris meets one of these prongs, we consider the time line: Harris entered the prior plea in 1997, submitted the income affidavit in 1998, was indicted on the instant offenses in 2003, and was convicted and sentenced in 2004. It is possible that, by giving the government a false picture of his income, Harris's 1998 affidavit impeded, complicated, or delayed the investigation that led to these charges, which would satisfy the first prong of § 3C1.1. *Cf. Tarwater*, 308 F.3d at 505 ("Tarwater's failure to report sizeable amounts of income was capable of influencing the IRS in the audit of Tarwater's tax returns."). As for § 3C1.1's second prong, Harris's submission of a false affidavit might have misled the government and affected its ability to effectively prosecute these charges. Lastly, the government could justify an enhancement under the third prong of §3C1.1 by showing that Harris's affidavit obstructed his sentencing here. The lack of complete information about Harris's income and deductions arguably prevented the government from exactly calculating tax loss. That relegated the district court to the estimation method in U.S.S.G. § 2T1.1 (the twenty percent default tax on gross income).

The district court must determine whether Harris's 1998 income affidavit was false, and whether it obstructed the investigation, prosecution, or sentencing of one of the instant offenses.

C.

Finally, Harris contends that he must be resentenced under *Booker* because the district court erroneously treated the Guidelines as mandatory and said it would impose a shorter prison term if the Guidelines were held to be merely advisory (96 instead of 151 months). When a district court treats the Guidelines as mandatory, there is a presumption that the sentence constitutes plain error that prejudiced the defendant and warrants resentencing. *US v. Martin*, 438 F.3d 621, 639 (6th Cir. 2006) (citation omitted). To rebut the presumption, the government must present "clear and specific evidence that the district court would not have . . . sentenced the defendant to a lower sentence" if it had treated the Guidelines as advisory. *Id.* As the government concedes, however, the district court stated that it would impose a *lower* sentence if the Guidelines were advisory, which confirms that treating the Guidelines as mandatory prejudiced Harris and warrants resentencing.

Harris asserts that "the district court must not impose a sentence more severe than the one [it] announced in the alternative, unless evidence of subsequent wrongdoing or other basis emerges to erase the appearance of vindictiveness which would otherwise arise." This argument lacks merit. When the district court stated Harris's alternative sentence, its view of Harris and his offenses was tainted by several errors, and it is impossible to predict how correcting those errors will affect its fashioning of a new sentence.

First, the district court erroneously used gross receipts rather than gross income when calculating tax loss under § 2T1.1. On remand, the government may show that Harris had gross income greater than the gross receipts used to calculate tax loss the first time. Second, the district court counted unpaid non-federal and FICA taxes as relevant conduct under § 1B1.3 without determining whether the nonpayment was potentially criminal under applicable laws. On remand, it might still count as relevant conduct all, some, or none of those nonpayments. Third, the district court added offense levels under § 3C1.1 due to obstruction without performing the required analysis. There is no way to tell whether it will impose an obstruction enhancement on remand.

If the district court properly analyzes these issues and imposes a sentence higher than the original alternative sentence, there will be no "appearance of vindictiveness." The new sentence will be based on analyses that were performed incorrectly or not at all last time. The "picture" of Harris and his crimes available at the original sentencing may be different from the picture available on remand.

> [In] cases in which the district court not only imposed a Guideline sentence but, treating the Guidelines as advisory, imposed as well an alternative sentence pursuant to the sentencing factors set out in 18 U.S.C. § 3553(a) . . . the alternative sentence does not implicate the Sixth Amendment and the sentence need not be remanded on account of *Booker*, but must be reviewed for reasonableness.

*US v. Till*, 434 F.3d 880, 887 (6th Cir. 2006). This rule is inapposite here, however, because the district court's alternative sentence was tainted by its erroneous determinations of tax loss, relevant conduct, and obstruction of justice. Thus, we cannot simply "sign off" on the alternative sentence.

VII.

43

For the foregoing reasons, we affirm Gary Harris's convictions but vacate his sentence and remand for resentencing. The district court must resentence Harris in accordance with this opinion, including the following four items. First, in calculating tax loss under U.S.S.G. § 2T1.1, the district court must receive evidence and determine Harris's gross *income*, not gross receipts, before applying the twenty percent and/or twenty-eight percent rates. Second, in determining relevant conduct under § 1B1.3, the district court may include Harris's nonpayment of state, local, and FICA taxes only if it determines that such nonpayment "amounts to an offense for which a criminal defendant could potentially be incarcerated" under the law of each jurisdiction, as required by *Shafer*, 199 F.3d at 831. Third, in determining whether Harris's offense level should be increased for obstruction under § 3C1.1, the district court must determine whether the alleged obstruction occurred "during the investigation, prosecution or sentencing of the instant offense[s] of conviction." Fourth, under *Booker,* the district court must treat the Guidelines as advisory only, and it must consider the recommended guideline range, the Commission's commentary, and the factors set forth in 18 U.S.C. § 3553(a). The district court should provide some record of its reasoning on each of these issues in case of further appellate review. *Till*, 434 F.3d at 887.

## VIII.

Next, Schwentker argues that the evidence presented at trial was insufficient to support finding her guilty beyond a reasonable doubt of a § 371 conspiracy to defraud the IRS. We disagree.

We review de novo the denial of a motion for acquittal. *US v. Tran*, 433 F.3d 472, 476 (6th Cir. 2006), *cert. denied*, – U.S. –, – S.Ct. –, 2006 WL – (Oct. 2, 2006). We may reverse the district

44

court's ruling only if, "after viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *US v. Johnson*, 440 F.3d 832, 839 (6th Cir.), *cert. denied*, – U.S. –, – S.Ct. –, 2006 WL – (Oct. 2, 2006). "We are bound to make all reasonable inferences and credibility choices in favor of the jury's verdict." *Id.* Moreover, our "general hesitancy to disturb a jury verdict applies with even greater force" where, as here, the district court has already considered and denied a motion for acquittal. *US v. Lee*, 359 F.3d 412, 418-19 (6th Cir. 2004).

Nonetheless, there must be substantial evidence on each element from which a jury could find Schwentker guilty beyond a reasonable doubt. Substantial evidence "must do more than create a suspicion of the existence of the fact to be established." *Hoxie v. DEA*, 419 F.3d 477, 482 (6th Cir. 2005) (citation omitted). Substantial evidence is "more than a mere scintilla. It is such relevant evidence as a reasonable mind might accept to support a conclusion." *US v. Orrico*, 599 F.2d 113, 117 (6th Cir. 1979).

To prove Schwentker guilty of conspiracy to defraud the IRS, the government did not have to prove that she violated a substantive statute. *US v. Douglas*, 398 F.3d 407, 412 (6th Cir. 2005) (citation omitted). Rather, it had to show that (1) two or more people agreed to accomplish an illegal objective against the US; (2) Schwentker willfully became a member of the conspiracy; (3) one of the conspirators thereafter knowingly committed at least one overt act at about the time and place alleged; and (4) that act was knowingly done in furtherance of some object or purpose of the conspiracy. *US v. Beverly*, 369 F.3d 516, 532 (6th Cir.), *cert. denied*, 543 U.S. 910 (2004).

As to the first element of conspiracy, proof of a formal agreement is not necessary; a "tacit or material understanding among the parties" will suffice. *Martinez*, 430 F.3d at 330. A conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan. *Id.* (citation omitted). As to the second and third elements, a defendant's knowledge of and voluntary participation in the conspiracy may be inferred from his conduct and established by circumstantial evidence. *Id.* Once the government establishes a conspiracy beyond a reasonable doubt, the defendant's connection to it need only be "slight." *Id.*

A conviction does not require proof that Schwentker was an active participant in every phase or aspect of the conspiracy, *Beverly*, 369 F.3d at 532, or that she played more than a minor role, so long as she understood the conspiracy's essential nature and intentionally joined, *US v. Warner*, 690 F.2d 545, 550 (6th Cir. 1982). The defendant need only know of the conspiracy, associate herself with it, and knowingly contribute her efforts towards its furtherance. *Beverly*, 369 F.3d at 532.

Schwentker attacks three overt acts that the indictment alleges she committed in furtherance of the conspiracy with Harris and Kotula. First, Schwentker attacks the allegation that T&M received royalties from a company when T&M rendered no services warranting such payments:

> The evidence presented at trial, not only failed to establish that [Schwentker] knowingly participated in a conspiracy, the evidence actually established that she was unaware of any attempt to hide assets. The Government used the tax returns she filed on behalf of T&M as an example of how tax returns should be filed in order to alert the Government to the source and distribution of funds.
>
> . . . .
>
> [Agent Fisher] noted that [Schwentker] correctly identified money that came in as loans, correctly provided the documents which would have permitted assessment of whether the loans were legitimate and correctly provided the checks to her accountant that would have identified MC Sign as the source of the disputed income. . . . .

[Agent Fisher] also testified . . . that if T&M had invested money in MC Sign, the royalty payments [to T&M] could have been legitimate income from MC Sign. He testified . . . upon being presented with that Government exhibit that it appeared to show just that, an investment by T&M in MC Sign. . . . His testimony clearly establishes that the overt acts identified in connection with the T&M and MC Sign transactions do not support a conclusion that [Schwentker] knowingly participated in a conspiracy to help Gary Harris evade income taxes. The evidence on these matters actually establishes that if there was such a conspiracy, they forgot to tell [Schwentker] because the forms she filed, in conjunction with the raw data left with her accountants in the event of an audit, reveal all of the sources of income and to whom each and every payment was made.

Second, Schwentker attacks the sufficiency of the evidence for the claim that she treated certain T&M expenditures as expenses when she knew they were her own income. Schwentker states that, even if she misclassified some T&M expenditures, that "is not evidence that she knowingly aided the concealment of Gary Harris' income." Agent Fisher suggested that a T&M "child care" expense should have been counted as income to Schwentker, but acknowledged that his opinion was speculative. Schwentker further argues,

There is also no doubt that the issue of whether certain medical payments [by T&M?] should have been treated as personal income was only speculation. As Mr. Fisher testified, [Schwentker] showed each of her accountants all of the T&M checks and asked each of them how the various payments should be reported. There was even testimony that [Schwentker] had been told that it was perfectly all right to treat her medical expenses as a business expense. It is clear, therefore, that those overt acts do not establish an attempt to evade, or an actual evasion of, the payment of income tax or the failure to file accurate forms in support of such payment. More importantly, those overt acts and the testimony, or lack thereof, with regard to those overt acts, do not establish that [Schwentker] conferred with any co-conspirators or worked in concert with other individuals for the purpose of evading taxes which allegedly may have been due had the unnamed expenses been declared as personal income.

47

Schwentker's third attack on the evidence concerns off-shore accounts. On dates not specified by Schwentker, Harris provided two $10,000 checks and a $312,000 check for deposit into new accounts at TSB Bank Channel, Ltd. Schwentker explains that Harris intended the large account and one of the small accounts to benefit her and their children:

> As one of the [$10,000] accounts was to benefit [Schwentker] and her children by Gary Harris, she was issued a debit card . . . and, therefore, signed the necessary forms which caused the account to be opened. There was never any testimony that [Schwentker] was ever informed that the funds used to open those accounts were in any way laundered to avoid the payment of income taxes, or that they were funds upon which income tax would have been due.

> In fact, *the only inference that can be drawn from the opening of those accounts is that they were a legitimate attempt, by the father of her children, to help [Schwentker] defray the living expenses involved in the raising [of] her children.* The records of those accounts indicate that [Schwentker] did not use the debit card, except for an initial purchase upon opening the account, until Mr. Harris was not available to contribute to day-to-day expenses because he had gone to prison.

> The third account at TSB . . . [containing $312,000] was opened for the educational benefit of the children of Gary Harris and [Schwentker], as the records introduced at trial indicate. There was never any testimony or evidence introduced to indicate that [Schwentker] thought anything other than that the father of her children was opening an account to provide for their future. * * * [T]*he testimony indicated Mr. Harris appeared to have an enormous amount of wealth.* He was involved with numerous highly lucrative companies and large numbers of people with whom he was associated had no knowledge that any of the apparent wealth resulted from a failure to pay taxes. *Thus, a large account to provide for his children's education was not necessarily indicative of anything other than what it purported to be.* * * *

> Mr. Fisher testified that there was nothing wrong, in and of itself, with putting money in an off shore account, that he was aware there was evidence that the large account was opened as a college account for the children, and indicated that Mr. Harris had reported that money as a personal asset. In short, there is nothing about [Schwentker's] participation in the opening of these accounts that evinces her knowing participation in a conspiracy to defraud the United States Government.

However, we conclude that the government introduced sufficient evidence from which the jury could reasonably infer that Schwentker knew about the conspiracy, understood its nature, knowingly and voluntarily associated herself with it, and contributed her efforts towards its furtherance.

Despite testimony that Schwentker had no entrepreneurial or management experience, Schwentker formed T&M as a business consulting firm in 1993 and served as its president through at least 2002. In 1995, Harris sold a business named MC Sign; the contract required the buyer to retain Schwentker as a business consultant at $1,500 per month, to pay T&M $47,000 up-front, and to pay three percent of annual gross sales to T&M as royalties. Schwentker had nothing to do with MC Sign before Harris sold it, and it took the new owner only two days to conclude that she had nothing to offer. The new owner continued to pay Schwentker's monthly fee, but he asked her not to come back; after six years, the new owner paid a lump-sum "royalty settlement" of about $101,000 to end the arrangement.

Apart from MC Sign, Harris directed $25,000 to T&M in 1995 from a land sale, and in 1997 he gave T&M land worth $70,000. Schwentker asserts that "the evidence clearly indicates that T&M was legally entitled to the money because of real estate contributed to the transaction," but she does not specify where in the record this alleged evidence is located.

In addition, T&M declared losses for every year in which Schwentker filed a tax return for it. Fisher testified that this was part of a scheme to take funds that should have been taxed as income to Harris, and divert them to T&M (whose losses would prevent it from paying tax) and Schwentker

(who received income for services that she and T&M apparently did not render, or which were not useful to the recipient), enabling Harris to evade the personal income tax due on those amounts.

The jury could reasonably credit Fisher's characterization of the role T&M and Schwentker played in the scheme, given Schwentker's lack of relevant experience, the new MC Sign owner's conclusion that her services were not of value, and T&M's lack of demonstrated business relationship with the entities and transactions from which Schwentker and T&M received payment.

Moreover, in the week after depositing the MC Sign settlement check into T&M's bank account, Schwentker turned around and wrote a $15,000 check to the manager of Harris/GH Group's amusement park, supposedly as reimbursement for a loan he made to Harris; Schwentker also wrote checks of $11,400 and $16,200 to other Harris companies. Schwentker's accountant testified that she had given him the information needed to verify the loan in question, and the jury could have relied on that testimony to conclude that T&M really was repaying a loan rather than trying to conceal who earned the income. But in light of the other suspicious circumstantial evidence, the jury could also conclude that Schwentker helped Harris by using T&M to play a "shell game," moving funds around between Harris entities so the IRS could not ascertain which company or person had earned it.

The inference that Schwentker's participation in the scheme was knowing and voluntary, and done with the purpose of furthering its object, was further supported by evidence that she knew about Harris's anti-tax sentiment. Schwentker did not merely hear Harris express political views in opposition to federal taxation of income, which certainly need not betoken tax evasion. Rather,

Schwentker heard Harris admit his non-compliance with the tax laws. Schwentker does not contest that in 1995 she was present during a meeting between Harris and her accountant John Kikkunen, during which Harris admitted that he did not file federal tax returns. After the meeting, Kikkunen told Schwentker that he would no longer work for her because he was "not in business to circumvent the federal tax law." From this evidence, the jury could infer that Schwentker knew Harris was intentionally violating federal tax law, and that the unusual transactions she and T&M profited from were shams designed to evade taxes and confuse the paper trail.

Thus, even if the jury disbelieved the government's allegations regarding the off-shore accounts and Schwentker disguising her income as T&M expenses, there was sufficient evidence to find her guilty of conspiracy to defraud the IRS with Harris.

Schwentker also contends that her conviction for 18 U.S.C. § 371 conspiracy to defraud the IRS is against the manifest weight of the evidence. We disagree.

The district court's duty was to compare the opposing proofs, weigh the evidence, and set aside the verdict if it finds that it is "against the clear weight of the evidence." *Barnes*, 401 F.3d at 743. The district court may reverse the conviction if the government presented enough evidence to convict, but the judge disagrees with the jury's resolution of the conflicting evidence. *US v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998). The district court may act as a thirteenth juror, considering the credibility of the witnesses and the weight of the evidence to insure that there is not a miscarriage of justice. *Id*. Our role, however, "is not to sit as a thirteenth juror and re-weigh the evidence, but to examine the evidence to determine whether the district court's ruling that the verdict is not against

the manifest weight of the evidence was a clear and manifest abuse of discretion." *Id.* (quotation marks omitted).

Schwentker offers a plausible interpretation of the evidence and a serviceable explanation of her innocent state of mind and the business purposes behind some of the T&M and other transactions. But the guilty verdict against Schwentker was not unreasonable. The jury was free to draw inferences, assess witnesses' credibility, and interpret the evidence for or against Schwentker. The fact that Schwentker's account of events and their legal significance is itself reasonable did not obligate the district court to disturb the decision of Schwentker's peers. *See Barnes*, 401 F.3d at 743.

Indeed, even if we found Schwentker's account of events *more reasonable* than the government's, that would not render the government's account unreasonable. *Porter v. Lima Mem. Hosp.*, 995 F.2d 629, 635 (6th Cir. 1993) ("[T]he verdict should not be considered unreasonable simply because different inferences could have been drawn or because other results are more reasonable."). This is not the "extraordinary circumstance where the evidence preponderates heavily against the verdict" against Schwentker. *US v. Graham*, 125 F. App'x 624, 628 (6th Cir. 2005).

IX.

Like Harris, Schwentker and Kotula contend that their convictions should be vacated due to the admission of agent Koritala's testimony about statements by alleged "abusive shelter promoter" Douglas Carpa, who is not charged in this matter. This argument lacks merit.

Immediately after Koritala testified, the district court cautioned the jury that the government had introduced Koritala's testimony only against Harris and not against the other defendants. We

presume that jurors follow the court's instructions. *US v. Savoires*, 430 F.3d 376, 380 (6th Cir. 2005). Therefore, absent good reason to believe otherwise, we hold that the jury's convictions of Schwentker and Kotula were not based on or influenced by agent Koritala's testimony against Harris.

X.

Schwentker contends that the district court abused its discretion by admitting the testimony of IRS agent Fisher. She claims that the U.S. failed to comply with FED. R. CRIM. P. 16(a)(1), Government's Disclosure - Information Subject to Disclosure, which provides,

> (G) Expert witnesses. – At the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief. . . . The summary provided under this subparagraph must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

FED. R. CRIM. P. 16(a)(1)(G). If the government does not timely disclose the summary, FED. R. CRIM. P. 16(d)(2) authorizes the district court to prohibit the government from introducing the undisclosed testimony, or to make such other order as is just under the circumstances. Unhelpfully, the Rule does not specify *when* the government must produce the summary, e.g., a certain number of days after the defendant's request, before the trial starts, or before the expert testifies.

Schwentker alleges that the government did not provide a summary of Fisher's testimony until the eve of trial, a tactic that left her inadequate time to prepare to counter the testimony. The government responds that it made its first 16(a)(1)(G) disclosure on September 5, 2003, nearly four months before trial started, and supplemented it on December 17, 2003. The government does not specify which disclosure contained the required material about Fisher's expected case-in-chief

testimony, so we assume it was the later disclosure on December 17, 2003. That was right before trial started. The government points out, however, that Fisher did not testify until six weeks later, on January 27, 2004, which gave Schwentker adequate time to prepare to counter Fisher's testimony.

For two reasons, we review a district court's rulings regarding FED. R. CRIM. P. 16(a)(1)(G) disclosure only for an abuse of discretion. First, the abuse-of-discretion standard governs evidentiary rulings generally. *US v. Abboud*, 438 F.3d 554, 579 (6th Cir. 2006), *pet. cert. filed*, 75 U.S.L.W. 3106 (U.S. Sept. 7, 2006) (No. 06-348). Second, we used the abuse-of-discretion standard to review determinations that an expert disclosure met the requirements of predecessor FED. R. CRIM. P. 16(a)(1)(E). *US v. Tarwater*, 308 F.3d 494, 515 (6th Cir. 2002) (citing *US v. Azad*, 809 F.3d 291, 294 (6th Cir. 1986)); *US v. Wells*, 211 F.3d 988, 996 (6th Cir. 2000) (citing, *inter alia*, *US v. Bonds*, 12 F.3d 540, 554 (6th Cir. 1993)).

Even where it is an abuse of discretion to admit expert testimony without FED. R. CRIM. P. 16(a)(1)(G) compliance, "reversal is inappropriate unless the defendant establishes prejudice by demonstrating that it is likely that had the government complied with the discovery rule (not had the evidence been suppressed), the verdict would have been different." *US v. Batts*, 171 F. App'x 977, 982 (4th Cir.) (citation omitted), *cert. denied*, – U.S. –, – S.Ct. –, 2006 WL – (Oct. 2, 2006); *cf. US v. Lopez*, 271 F.3d 472, 483-84 (3d Cir. 2001) (reversal proper only when FED. R. CRIM. P. 16 violation results in "prejudice to substantial rights").

54

It might have been better to require the government to provide Schwentker with the requested summary by a date certain well in advance of trial, as numerous courts have done. *See, e.g., US v. Ma*, No. 03CR734, 2006 WL 708559, at *18 (S.D.N.Y. Mar. 21, 2006) ("While no specific timing requirements are imposed, the Committee Notes also say that disclosures are expected to be made in a 'timely fashion.' Accordingly, if the government expects to use any expert witnesses at trial, the government is directed to disclose them to defendants no later than two weeks before trial."). The government's statement that it provided the summary weeks before Fisher testified is not completely reassuring because that was right before trial started, and defense counsel had little time to prepare an effective cross-examination while participating in a complex trial.

Nonetheless, there are two reasons why reversal is not warranted by the government's somewhat belated disclosure of the Fisher summary. First, while we might prefer Schwentker to have had the benefit of the summary farther in advance of trial, the Rule contains no such requirement. It is for Congress to amend FED. R. CRIM. P. 16(a)(1) to impose any such bright-line temporal limitation, and Congress has not chosen to do so.

Moreover, defense counsel had *some* time in the weeks between receiving the summary and confronting Fisher in court, and Fisher was extensively cross-examined regarding his qualifications, his work on this case, and the basis for his opinions on the taxes due from defendants. *Cf. US v. Seiber*, No. 96-6463, 142 F.3d 438, 1998 WL 165153, at *4 (6th Cir. Apr. 3, 1998) (although the government did not disclose the expert's qualifications until just after the expert testified on Friday morning, defendant was not prejudiced, because he still had time to recall the expert for cross or

move to exclude his testimony, but failed to do so). In addition, Schwentker has not claimed that Fisher's testimony exceeded the scope of the summary or otherwise unfairly surprised her. *Contrast US v. Beltran-Arce*, 415 F.3d 949, 953-54 (8th Cir. 2005).

For these reasons, we conclude that the district court did not abuse its discretion by admitting Fisher's testimony. *See generally US v. Sarracino*, 340 F.3d 1148, 1170 (10th Cir. 2003), *cert. denied sub nom. Cheresposy v. US*, 540 U.S. 1131, *and sub nom. Manuelito v. US*, 540 U.S. 1133 (2004).

In addition, even assuming arguendo that the district court should have excluded Fisher's testimony, we are not convinced that its admission prejudiced Schwentker's substantial rights, *US v. Lopez*, 271 F.3d 472, 483-84 (3d Cir. 2001), or that an earlier disclosure likely would have led to a verdict of acquittal, *US v. Chastain*, 198 F.3d 1338, 1348 (4th Cir. 1999). *Cf. Tarwater*, 308 F.3d at 516 (although the government gave defendant revised summary of expert's expected testimony just the day before the expert testified, there was no 16(a)(1)(E) violation because the revisions were necessitated by information acquired from defendant "not long before trial," defense counsel had a chance to review revised report that evening, and defendant did "not suggest how the outcome of the case would have been different if he had learned about [the expert]'s revised computations earlier").

Schwentker further claims that, although the district court promised to conduct limited *voir dire* of Fisher to determine whether he was qualified to give the offered testimony, it never did so. Schwentker contends Fisher's testimony demonstrated that he was not qualified to give the testimony, but she fails to specify *how and why* Fisher was not qualified.

The government responds to Schwentker's assertion that Fisher was unqualified and her contention that the district court should have held a *Daubert* hearing:

> Fisher was a properly qualified expert. He had specialized tax audit and accounting training that made him well-suited "to assist the jury in understanding the large amount of documentary evidence presented by the government and the tax implications." *United States v. West*, 58 F.3d 133, 140 (5th Cir. 1995); . . . .
>
> . . . .
>
> No *Daubert* hearing was required here. The District Court's gatekeeping responsibility was to ensure that Fisher's testimony was relevant and reliable. Before eliciting Fisher's expert opinions, the government established that he was an IRS agent assigned to the Special Enforcement Program. He worked with IRS criminal investigators and federal prosecutors, performing financial analysis and testifying in court. [JA] 3771-72. Before that assignment, Fisher had been an IRS revenue agent for 15 years, performing audits of individuals, corporations, partnerships, and trusts. He had done more than 500 such audits. Fisher had a college degree in accounting and . . . extensive continuing professional education within the IRS. [JA] 3772-73.
>
> . . . .
>
> Fisher was extensively cross-examined on a variety of topics: his professional background and experience, his work on the instant case, ([JA] 3864-69), the technical basis for his "taxes due" opinions ([JA] 3869-77], and his opinion that Kotula's sale did not qualify for tax deferral ([JA] 3896-3913).

Schwentker's opening brief fails to identify any shortcoming in Fisher's qualifications or methodology, either generally or as related to the testimony he gave. Schwentker's reply does not address the Fisher issue, let alone contest the government's statement of Fisher's qualifications. Thus, Schwentker has abandoned or waived the argument that Fisher was unqualified. *See Caudill v. Hollan*, 431 F.3d 900, 915 n.13 (6th Cir. 2005) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (citation omitted).

XI.

Schwentker also contends that the district court should have excluded evidence that codefendant Harris purchased gold and silver and used secret accounts in a warehouse bank:

> [Schwentker] had no connection to these activities but the evidence necessarily buttressed the government's case on the conspiracy count, and therefore, unfairly prejudiced [Schwentker]. The jury could have been convinced by this evidence, along with the cumulative effect of Agent Koritala's testimony, also inadmissible against [Schwentker], that Mr. Harris engaged in tax fraud [presumably, with "untaxing" scheme promoter Douglas Carpa] during the conspiracy period. Because it was conspiracy that was alleged, in order to find Mr. Harris guilty, the jury necessarily had to find co-conspirators . . . . This is true despite the fact that [Schwentker's] connection to the testimony was attenuated at best. It is, therefore, highly likely that this prejudicial evidence contributed to the finding of guilt against [Schwentker] simply by strengthening the evidence against Mr. Harris on . . . the conspiracy count. This prejudicial error is compounded by the fact that the evidence had no relevance to the issue of conspiracy among the co-defendants, especially when any evidence of conspiracy is so weak.

Although Schwentker does not cite any rule, she essentially contends that the precious-metals and warehouse-bank evidence was substantially more prejudicial than probative under FED. R. EVID. 403. The government's brief does not respond to this argument.

It was IRS Agent Walker who testified about Harris's use of precious metals and the CPA bank. While discussing an account statement and other documents bearing Harris's name or account number that were seized in a search of the CPA's Portland, Oregon premises, Walker testified:

> Q. Now, this first group right here, it says balance carried forward. What does this mean here?
> A. [T]he balance carried forward referred to your previous statement of your last activity. And then below that you have federal reserve notes, gold units, silver coin units, and silver rounds. And that's basically if you had – that would show you how you had your money held.

> If you deposited money and you wanted to buy gold coins, it would tell you how much you had in units. If you wanted to keep it in federal reserve notes, which is actual dollars, that's what the balance would reflect.

> Q.   And in the next section here, it says deposits received?
> A.   Yes.

> Q.   Do you know what this refers to?
> A.   Yes. That was a representation of what you actually, you submit to the coin exchange. So if you sent them checks they would give you a total of your checks. If you sent them cash, they would identify how much cash you had, and if you decided you wanted to deposit and use your gold coins or your silver coins, you would deposit that and they would give you how much they received, give you a balance of that.
>                                     . . . .
> Q.   And turning to the next page of this document here.
> A.   This document is dated November 10th, 1995.

> Q.   What does this document show here?
> A.   This document will actually show a deposit of checks in the total amount of $3,000. And then later at the bottom it shows that the money was sent out in cash of $2,895. And there was also another $60 transfer fee or fee there. And then there was a transaction charge for the actual transaction.

> Q.   And what's that transaction charge?
> A.   The transaction charge is the fee for the purchase, or how they sent the money back out. They did – down there they also charge you for your deposit. [T]he deposit fee was like 2 percent of your deposit for the first $500, and then I think it was –

> Q.   So the transaction charges that's the money that the Christian Patriot Association gets; is that right?
> A.   Yes.

Walker testified about other warehouse-bank statements and mail receipts that showed much larger

deposits to Harris's account, followed by a processing fee for the deposits and a transaction fee when

59

the bank sent the remainder of the deposits back to Harris or to conventional-bank accounts of Harris or his companies.

Agent Walker also testified about the CPA's literature, which emphasizes that the CPA does not provide records to the IRS, does not admit the existence of a client's account or the presence of funds in the account and, arguably at least, implies that the bank would not cooperate with a summons, subpoena, or levy.

As with agent Koritala's testimony about Carpa's statements, agent Walker's testimony about Harris's use of the warehouse bank was highly probative of Harris's state of mind with regard to defrauding the IRS. It is not illegal to use a warehouse bank, conduct one's affairs in cash, or keep one's savings in precious metals rather than dollar notes, but that does not prevent a reasonable jury from inferring Harris's intent to evade in part from Harris's use of such measures, which the CPA and Carpa touted as effective means of thwarting government tax investigation. Thus, Walker's testimony about Harris's use of precious metals and the CPA warehouse bank was highly probative of the *mens rea* element of the offenses charged against Harris. Conversely, there was a risk that the jury would find that, because Harris associated and conducted business with people who touted strategies for tax evasion, his employee and girlfriend Schwentker must have conspired with Harris to evade taxes. *US v. Chance*, 306 F.3d 356, 385-86 (6th Cir. 2002) ("[E]stablishing guilt by association . . . is an improper manner by which to obtain a conviction . . . ."). On balance, it is not an abuse of discretion to find that the probative value of Walker's testimony as to Harris's *mens rea* was not substantially outweighed by the risk of unfair prejudice to Schwentker.

XII.

Next, Schwentker argues that under FED. R. EVID. 404(b), the district court abused its discretion in admitting evidence of other wrongful acts by her codefendants. Schwentker contends that the district court should not have admitted evidence that Harris and Kotula failed to file returns for years or entities that are outside the scope of the instant alleged conspiracy, e.g., the Conneaut Lake park (for a time owned and operated by Harris or GH Group).

Schwentker contends that none of this evidence was probative of the offenses charged, and its admission prejudiced her because it was used to support the government's case on the conspiracy charge. Generally, Schwentker contends that Harris and Kotula's past failure to file returns cannot demonstrate knowledge of the federal tax laws and the obligations they impose. As to the failure to file returns for the amusement park, Schwentker states that there is no evidence that Harris or Kotula was responsible for paying employee withholding taxes relating to the park. Lastly, Schwentker asserts there is no basis to conclude that the park's failure to pay taxes furthered the instant conspiracy. (The government's brief does not address the 404(b) issue.)

We disagree with Schwentker. Federal Rule of Evidence 404(b) provides,

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

The list of purposes for which other-acts evidence may be admitted is not exhaustive; evidence may be admitted for additional, similar purposes. *US v. Bakke*, 942 F.2d 977, 981-82 (6th Cir. 1991).

Because Schwentker preserved the issue by objecting below, we apply the usual tripartite test for admission of evidence under FED. R. EVID. 404(b). First, we review for clear error the factual finding that the other acts occurred; second, we review de novo the determination that the evidence was admissible for a legitimate purpose, rather than to prove defendant's character and action in conformity with that character; and third, we review for abuse of discretion the determination that the "other acts" evidence is not substantially more prejudicial than probative under FED. R. EVID. 403. *US v. Matthews*, 440 F.3d 818, 828 (6th Cir.), *cert. denied*, – U.S. –, 126 S.Ct. 2370 (2006).

Under the first other-acts criterion, evidence is admissible under 404(b) only if it is relevant. *Matthews*, 440 F.3d at 828. This requires that other-acts evidence be admitted only if the district court concludes that the jury could reasonably find, by a preponderance of the evidence, that the other acts occurred and that the defendant was the actor. *Id.* "[S]uch findings need not be express, but rather, may be implicit by virtue of the fact that the court admitted the evidence." *Id.* Schwentker does not deny that the jury reasonably could have found, by a preponderance, that the other acts occurred, i.e., that Harris and Kotula failed to file returns for themselves or Harris-affiliated entities (such as the park) in years prior to this conspiracy. Accordingly, she provides no basis to conclude that the district court clearly erred in its implicit finding to that effect. *Cf. US v. Logan*, 250 F.3d 350, 368 (6th Cir. 2001) ("Appellants do not contest the first . . . element[], implicitly admitting that the bad acts transpired . . . .").

Under de novo review of the second other-acts criterion, the district court did not err in determining that the evidence was admissible for a legitimate purpose, rather than to prove defendants' character and action in conformity with that character. Harris and Kotula both denied that they intended to violate federal tax law. Harris claimed that he had no intent to evade the taxes due on his income for years covered by the prior plea, but honestly believed that his compliance with the prior agreement satisfied his liability for those years. Harris also claimed that his failure to file while he was incarcerated stemmed not from an intent to evade, but from his honest belief that incarceration entitled him to an extension of time. *Cf. Matthews*, 440 F.3d at 827-29 (not abuse of discretion to admit testimony that defendant made drug transactions *eight years* before the charged drug offense, because it tended to rebut defendant's claim that he found the bag of cocaine on the ground, did not know what it was, and put it in his pocket anyway). Kotula likewise denied ever intending to violate a known duty under the federal tax laws during the alleged conspiracy period.

Accordingly, evidence that Harris failed to file returns for himself or his companies for other, earlier years was admissible as "proof of motive, . . . intent, preparation, plan, knowledge, [and] . . . absence of mistake or accident." FED. R. EVID. 404(b). The jury could reasonably infer that such a sustained streak of non-filing and nonpayment by Harris and Kotula reflected not a mistaken understanding of their duties under federal tax law, but an intent to shirk those duties. *Cf. US v. Popenas*, 780 F.2d 545, 548 (6th Cir. 1985) (in prosecution for tax evasion, it was not an abuse of discretion to admit returns from seven prior years, because they arguably showed a pattern of under-reporting income, from which the jury might reasonably infer that the charged evasion was willful);

*US v. Ausmus*, 774 F.2d 722, 727-28 (6th Cir. 1985) (in prosecution for willfully failing to pay taxes, it was not an abuse of discretion to admit evidence that he failed to pay taxes for years before and after the years charged in the indictment, to show a pattern, plan, or scheme and dispel the notion that the charged nonpayment was due to negligence or inadvertence).

Of course, the jury might also conclude that all of Harris's and Kotula's non-filings and nonpayments, both within and outside the conspiracy period, were caused by a sincere belief that they were not required to file returns and pay taxes, or that they had already done all that was required. But the fact that the jury could find either way does not negate the legitimate purpose for which the evidence was admitted, and the reasonable inference that could be drawn from the evidence on the issue of Harris's and Kotula's *mens rea* and lack of mistake.

Under the third other-acts criterion, it is not an abuse of discretion to find that the "other acts" evidence is not substantially more prejudicial than probative under Rule 403. To determine whether other-acts evidence is probative of intent, we ask whether the evidence relates to conduct that is "substantially similar and reasonably near in time to the specific intent offense at issue." *US v. Haywood*, 280 F.3d 715, 721 (6th Cir. 2002) (internal quotation marks and citations omitted). "When an act and a charged offense are so dissimilar that the act has no logical tendency to prove the intent element of the charged offense, no degree of temporal proximity will infuse the act with probative value." *Id.* at 722.

As to the first element of the third other-acts criterion, Schwentker does not deny that the other acts are substantially similar to the charged offenses, and they are: the other acts were a failure

to file federal income tax returns and pay federal income taxes, and the charged offenses were conspiracy to evade federal income taxes (by all three defendants), tax evasion by Harris, and tax evasion by Kotula. *See Abboud*, 438 F.3d at 582-83 (evidence that defendant previously paid employees "under the table" to evade payroll taxes, was properly admitted under 404(b) where it was sufficiently similar to the instant charged offenses of failure to file a return and filing a false return); *US v. Jerkins*, 871 F.2d 598 (6th Cir. 1989) (evidence that defendant made late return filings in 1969-1971 was properly admitted under 404(b) as sufficiently similar and close in time to charged offenses, which involved land transactions starting in 1977, preparation of defendant's own false returns in 1982 and 1984, and preparation of false returns for defendant's client from 1980-1982).

> As to the second element of the third other-acts criterion, Schwentker states,

> The Court [in *US v. Haywood*, 280 F.3d 715 (6th Cir. 2002)] held that the five[-]month period between the charged act and the other act sought to be admitted by the government was so great that greater similarity was required before the other act could be admitted. Therefore, the Sixth Circuit held that the district court erred in admitting the other[-]act evidence.

But Schwentker's reliance on *Haywood* is misplaced. Although the time elapsed between the other acts and the charged conduct is a factor to be considered, this court has declined to adopt a bright-line rule regarding remoteness. *Matthews*, 440 F.3d at 830 (citation omitted) ("There is no absolute maximum number of years that may separate a prior act and the offense charged."). Moreover, the nature of the other acts and the charged offenses must inform the analysis of whether the former are sufficiently close in time to the latter. *Id.* ("[T]he prior conduct must be reasonably near in time *under the facts of the particular case*.") (emphasis added)).

65

Absent evidence to the contrary, our understanding is that federal individual and corporate income tax returns are generally due annually. *See Smith v. CIR*, 153 F. App'x 449, 450 (9th Cir. 2005) ("I.R.C. §§ 6011, 6012, and 6072 mandate that . . . Smith file a return for every year that he earns income.").[4] Consequently, any two instances of non-filing or nonpayment would necessarily be at least one year apart because the deadlines for two consecutive years' filing and payment are one year apart. It is not error to find that the other acts were sufficiently close in time to the conspiracy period to be probative of Harris's and Kotula's intent or knowledge with regard to tax years during the period. *Cf. US v. Middleton*, 246 F.3d 825, 835-36 (6th Cir. 2001) (in prosecution for attempted evasion of taxes due for 1992-1996, not an abuse of discretion to admit 1976 return under 404(b)).

Finally, Schwentker asserts that there is no basis to conclude that the amusement park's failure to pay taxes furthered this conspiracy. Even if true, this is beside the point: the admissibility of other-acts evidence does not turn on whether the other acts were intended to further, or actually did further, the charged offenses. Schwentker cites no authority to the contrary, and we find none.

The district court did not abuse its discretion in admitting evidence of Harris's and Kotula's alleged pre-conspiracy failures to file federal income tax returns and pay federal income taxes.

XIII.

---

[4]*See, e.g., Robinette v. CIR*, 439 F.3d 455, 462 (8th Cir. 2006) ("It is clear . . . that Robinette's duty to file a tax return *each year* was an express condition . . . .") (emphasis added); *Jimenez v. Gonzales*, 158 F. App'x 7, 8 (9th Cir. 2005) ("He filed a federal income tax return for the first time in 1990, and has filed returns *every year* since then.") (emphasis added).

Schwentker also contends that the district court abused its discretion by admitting Government Exhibit 452, a handwritten organizational chart, without requiring the government to authenticate the document and show foundation and relevance. The government provided no evidence regarding when the chart was created or who created it. Schwentker reasons that the chart prejudiced her by linking Kotula to the entities depicted, which bolstered the allegation that there was a conspiracy. Schwentker does not cite any evidence rule or case law in support of this argument, so she has waived it.

Moreover, Schwentker does not claim that she or the other defendants objected to the admission of the chart. Federal Rule of Evidence 103(a) provides,

> Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . [i]n case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context . . . .

FED. R. EVID. 103(a)(1). *See, e.g., US v. Midwest Specialties, Inc.*, 142 F.3d 296, 302 n.5 (6th Cir. 1998) (contractor waived claim that brake test results provided by government were not supported by affidavit or otherwise authenticated, because contractor never challenged authenticity before the district court) (citations omitted). FED. R. EVID. 103(d) states, "Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court." But Schwentker does not purport to show that admission of the chart was plain error.

## XIV.

The district court permitted the government to read the jury excerpts from Harris's deposition in two civil proceedings in Pennsylvania state court: *Asset Mgmt. v. Trustees of Conneaut Lake*

*Park, Inc.*, No. 1999-746 (Pa. Cmn. Pleas) and *Watson v. Trustees of Conneaut Lake Park, Inc.*,

Equity Case No. 1998-8, 765 A.2d 1068 (Pa. Cmn. Pleas 2002).

Schwentker and Kotula argue that the admission of Harris's civil testimony was error

requiring reversal because the testimony was allegedly hearsay, did not consist of coconspirator

statements under FED. R. EVID. 801(d)(2)(E), and its admission violated their Sixth Amendment

Confrontation Clause rights as interpreted by *Crawford*. Schwentker asserts that she "has standing

to raise this argument because the improperly admitted testimony was not in furtherance of the

conspiracy count under which she was charged and [she] had no opportunity to cross-examine Mr.

Harris."

For his part, Kotula explains that the erroneous admission of Harris's civil testimony without

a chance to cross-examine Harris, prejudiced him

> because it fingered Kotula as part of the "management team" at Conneaut Lake Park, which the government contended was a significant source of unreported income.
>                           . . . .
> Additional prior testimony of Harris related to Harris's relationship with Douglas Carpa with whom Harris was found to have conspired in regard to abusive trusts, and Asset Management, a matter with which, even the district court admitted, Kotula had no involvement. [JA] 4146-4147. [S]ince there was no opportunity for cross-examination, Kotula was unable to impeach this testimony.
>
> * * * This testimony . . . prejudiced Kotula because it was presented together with Harris's other testimony referencing [sic] Kotula and without cross-examination.

Kotula objected to admission of Harris's civil testimony at the time; Schwentker apparently

did not. The district court let them both argue against its admission. Kotula's counsel argued that

"[t]here's no nexus at all between any conspiracy to defeat the collection . . . of the tax obligations

of Mr. Kotula, Mr. Harris, and Ms. Schwentker in connection with [Harris] testifying before a Pennsylvania State Court Judge on a replevin action."

The trial judge responded that Harris's civil testimony took place within the alleged conspiracy period and was "related to the operation of Conneaut Park which is part and parcel of the government's conspiracy allegations . . . ." Therefore, it seemed to be an "open issue" whether Harris gave his civil testimony in furtherance of the instant alleged conspiracy.

Despite the prosecutor's initial in-court assurance that Harris's civil testimony was not being offered against Schwentker, Kotula's counsel retorted that "[i]f it's a conspiracy, it comes in against all of the defendants, and it reinforces our argument that it really should be out as to anyone except Mr. Harris, if it comes in at all." The judge responded, "Well, all the government has to prove . . . it doesn't require all three [defendants] be involved in . . . this particular matter." He may have meant that, to prove that Harris was part of this conspiracy, the government could introduce evidence that Harris committed an overt act in furtherance of the conspiracy – such as an act relating to Conneaut Lake or Asset Management – without proving that Schwentker and Kotula participated in that act. The district court's reasoning is not entirely clear on this issue.

The government introduced this excerpt from Harris's April 24, 2002, civil deposition:

Q.     What responsibilities . . . did you have [as] president of Summer Resorts?
A.     I was president as an honorary member. I'm not sure as to what portion of liability I would have or – I do remember them offering a position and at the time I was the trust manager for Resort Holding Trust which was buying the property.
                        . . . .
Q.     Let me stop you. You said "them," you were asked by "them." Who is "them"?

A.   A group of managers, a management team that had been hired to put the Park back together.  A group of people; I can't remember their names.

Q.   None of the names?
A.   I think Mike Kotula was with us early.

. . . .

Q.   [W]hat do you believe his occupation to be?
A.   Actually, he used to be an administrative assistant.

Q.   For?
A.   A number of companies that I was involved in.[5]

---

[5]The government also introduced an excerpt from Harris's August 12, 2002, deposition in another prior state civil case:

Q.   Mr. Harris, you've testified that you're the trust manager of Asset Management.
A.   That's correct.

Q.   What is Asset Management?
A.   It's a business holding trust organization.

. . . .

Q.   [A]t some point in the early '90s, 1994, you were looking into trust entities?
A.   Yes.  Yes, actually, in the '80s it started, but it ended up in the '90s with Crown Enterprises.

Q.   Now, the Crown Enterprises is the company that you went to to have these documents prepared for the trust?
A.   Yes.
Q.   What type of work did Crown Enterprises do with regard to the formation or creation of Asset Management?
A.   Well, they were the administrators for the trust.  They actually promote the trust as a tax shelter.  * * *

Q.   Did Crown Enterprises have the documents prepared to create Asset Management?
A.   Yes.

Q.   Did Crown Enterprises obtain the people who would act as trustees for the

trust?

A.    Yes. They organized the trust. . . . just the same as a trust lawyer would do.

Q.    Now, it identifies – there's a signature on that page identified as Douglas J. Carpa, trust officer. Was Mr. Carpa someone you communicated with in regard to the trust?

A.    Yes. I have talked with him. I don't recall the dates I talked to him, but I had talked to him and I had letters from him. But the main person I've talked to was Bloomquist.

. . . .

A.    He was the trust administrator.

Q.    Let's focus now on the events that led up to the August 1997 conveyance of the land of the park. [S]et the stage what led you to suggest . . . some type of conveyance . . . .

A.    . . . . I'd been indicted for one count of tax evasion for 1987. . . . I was at that time found guilty. I appealed. The Sixth Circuit confirmed [sic] my conviction. . . . .

Q.    What was . . . the anticipated function or purpose of this newly formed corporation, trustees of Conneaut Lake Park, Incorporated?

A.    [A] board of honorary members of the community . . . that would . . . make sure that it maintained itself as an amusement park. They had absolutely no control over the operation nor the assets. They only owned the land and the land, in our view, was at risk because of my involvement with the government.

Q.    And did your trust have involvement in operating the park in '98?

A.    In 1998 we helped select Conneaut Lake Park, Inc., the entity that was established to operate the park . . . at my direction, [it] opened the park after one of the previous people that had been selected by the board left. [W]e would have had no problem with them finding an operator after the settlement . . . . It was in our best interest. And the only reason the settlement . . . called for an operator [was] because they knew that I was going to go to jail, so we all knew that we needed a good operator. It wasn't that I was giving up rights to operate it.

I could have operated it under my lease, but I knew that I would not be there

71

At trial, the prosecutor offered Harris's civil testimony as coconspirator statements against all three defendants. The judge admitted the testimony for these reasons:

> First of all, it appears . . . that the testimony is [in the nature] of a statement made by a co-conspirator of a party during the course and in furtherance of the conspiracy.
> . . .
> These are preliminary findings . . . . They are certainly not – not final determinations, but based upon the state of the evidence of this case, the Court does believe that there has been a sufficient showing that there was a conspiracy in existence; that Mr. Harris and/or Mr. Kotula at least arguably were members . . . . [T]he defendant against whom this statement is offered is both Mr. Kotula and Mr. Harris, and again arguably at this point there has been some showing that they were members of a conspiracy.
>
> That the statement was made in furtherance of the conspiracy, I believe there's been sufficient evidence to show the same. The government has alleged overt acts related to Conneaut Park, the operation of the park, and other transactions related to same so there's been a sufficient showing of that fact.

We conclude it was not an abuse of discretion for the trial court to rule that Harris's civil testimony was a coconspirator statement admissible against Schwentker and Kotula.

---

> and I wanted them to feel that they were participating in it. These people wanted arm's length. These people didn't even know me and this tax, you know, investigation was really tainting the park and it was tainting them they felt.
>
> Q. You testified that you determined the land was at risk so you determined to donate it to the Conneaut Lake Park Preservation Fund. And then, subsequently, that didn't materialize and you determined to donate it to the trustees of Conneaut Lake Park. Why did you believe the land was at risk?
> A. [T]o be quite honest, I was dealing with a government agency, you know, and at that point, with my incarceration coming . . . . [I]t's possible they could have . . . seized it . . . .

The government then rested and trial concluded.

Kotula contends that Harris's civil testimony could not have been made "in furtherance of" this conspiracy because "[t]he last overt act referenced in the indictment was dated April 24, 2002, prior to Harris's testimony." This argument lacks merit. "[A] statement that simply informs a listener of the declarant's criminal activities is not made in furtherance of the conspiracy; instead, the statement must somehow advance the objective of the conspiracy." *US v. Manfre*, 368 F.3d 832, 838 (8th Cir. 2004) (quotation marks and citations omitted). The district court could reasonably find that Harris intended to advance this conspiracy through his depositions in civil actions that he instituted to regain operational control over the park.

As Kotula acknowledges, "Conneaut Lake Park was a part of the Count 1 conspiracy alleged by the government and a significant part of the tax loss." For its part, the government emphasizes Agent Torbic's testimony that the park was a source of cash for Harris, as well as Agent Fisher's testimony that the park was virtually audit-proof and that Harris failed to document and deposit some cash received by the park.

As the government points out, Harris admitted that he had not signed a federal income-tax return since 1981, and that he created the non-profit Trustees and transferred the park grounds to them in August 1997 because he was concerned that the government might seize the property to satisfy his delinquent tax obligations. The government's theory, which is not inconsistent with the record, is that Harris deliberately gave the appearance of conveying the entire amusement park – grounds, assets, and operating rights – to the Trustees, so that the government could not seize it to satisfy his tax liabilities.

Just a few weeks later, the U.S. Attorney approved the 1997 plea resolving the previous tax charges against Harris, which apparently led Harris to believe that the government no longer posed much risk of seizing the park. Harris began asserting that he had given the Trustees only the park's land, not its assets or the right to control and operate the park, and he sued the Trustees accordingly.

In sum, the government presented evidence sufficient to permit the jury's findings that the amusement park was used as part of an ongoing scheme to evade federal income taxes properly owed by Harris and/or GH Group. Harris intended his civil testimony to help restore his control of the park's assets and day-to-day operations – in other words, to regain a tool that had been useful to him and the alleged conspiracy. Thus, it was not clear error to conclude that Harris made the civil statements during the course of and in furtherance of the instant conspiracy. *See US v. Franklin*, 415 F.3d 537, 552 (6th Cir. 2005) (district court's determination whether a statement was made in furtherance of conspiracy is reviewed for clear error, not abuse of discretion like the ultimate 801(d)(2)(E) admissibility ruling) (citation omitted). In turn, it was not an abuse of discretion to admit Harris's civil statements as non-hearsay coconspirator statements under Rule 801(d)(2)(E).

## XV.

Schwentker and Kotula also contend that the district court erred by denying her motion for severance, given that a joint trial deprived them of Harris's exculpatory testimony and placed before the jury much evidence that was admissible only against Harris. We disagree.

We review the denial of a defendant's severance motion only for "clear abuse of discretion." *US v. Beverly*, 369 F.3d 516, 534 (6th Cir.) (citation omitted), *cert. denied*, 543 U.S. 910 (2004).

The severance of jointly indicted defendants is an "extraordinary remedy, employed only to alleviate 'a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'" *Franklin*, 415 F.3d at 556 (citation omitted). A defendant seeking severance "bears a strong burden and must demonstrate substantial, undue, or compelling prejudice." *Id.*

It is difficult to meet this burden by claiming that the jury probably considered evidence against one defendant that was introduced only against another: "juries are presumed to be capable of following instructions . . . regarding the sorting of evidence and the separate consideration of multiple defendants." *Franklin*, 415 F.3d at 556 (citations omitted).

The evidence may support the conclusion that Harris founded and played a far greater role in the conspiracy than Schwentker and Kotula, and the government did introduce evidence that pertained only or primarily to Harris and overt acts performed by him without any apparent assistance or coordination from Schwentker and Kotula. But "a defendant is not entitled to severance simply because the evidence against a co-defendant is far more damaging than the evidence against him." *Beverly*, 369 F.3d at 534 (citation omitted).

It is also plausible that Schwentker and Kotula would have had a better chance of acquittal if tried separately from Harris – in part because they could have subpoenaed Harris to testify. But a defendant does not acquire a right to separate trial merely because that would increase his chance of acquittal. *Id.* Even putting aside the presumption that the jury followed instructions and considered evidence only against the defendant against whom it was offered, speculative concerns

about the spillover of evidence against Harris are unavailing. "Absent a showing of substantial prejudice, spillover of evidence from one case to another does not require severance." *Id.*; *see, e.g., Ross v. United States*, 339 F.3d 483, 493-94 (6th Cir. 2003).

In short, it might have been reasonable to try Schwentker and Kotula separately from Harris,[6] but we do not conclude that the district court abused its discretion in refusing to do so.

XVI.

For the reasons previously discussed regarding Harris's conviction, we uphold the trial court's refusal to give Schwentker's requested jury instruction regarding good faith.

Also, Schwentker contends that the district court committed error requiring reversal in refusing to give two jury instructions that she requested: one regarding conspiratorial intent and the other regarding multiple conspiracies. However, Schwentker's appellate briefs did not specify where in the record we can find these requested instructions. We will not do Schwentker's work for her, and without the text of the requested instructions, we cannot meaningfully review the district court's refusal to give them.

XVII.

Finally, as conceded by the government, Schwentker is entitled to be resentenced due to a *Booker* error. Schwentker is not entitled, however, to the automatic imposition of the alternative sentence announced by the district court. The district court did not provide sufficient explanation

---

[6]The district court acknowledged to Schwentker's counsel, "the vast majority of the witnesses were not in any way, shape or form related to your client."

76

of its consideration of the Guidelines and the 18 U.S.C. § 3553(a) factors to enable us to determine whether the alternative sentence is reasonable. *See Till*, 434 F.3d at 887.

## XVIII.

For the foregoing reasons, we affirm Tamara Schwentker-Harris's conspiracy conviction but vacate her sentence and remand for resentencing consistent with *Booker*.

## XIX.

Unlike Schwentker, defendant Kotula does not contend that his convictions are against the manifest weight of the evidence. Kotula does argue, however, that the evidence presented at trial was insufficient to support finding him guilty beyond a reasonable doubt of conspiracy to defraud the IRS in violation of 18 U.S.C. § 371 (count one) or tax evasion in violation of 26 U.S.C. § 7206 (count five). We disagree. Kotula plausibly shows how a jury could conclude that he was not knowingly involved in the conspiracy and did not know he was violating federal tax law, but the jury was within its rights to credit the government's interpretation of the evidence over his.

We review de novo the denial of a motion for acquittal. *Tran*, 433 F.3d at 475. We reverse only if, "after viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Johnson*, 440 F.3d at 839. "We are bound to make all reasonable inferences and credibility choices in support of the jury's verdict." *Id.* Moreover, our "general hesitancy to disturb a jury verdict applies with even greater force" where, as here, the district court has already denied a motion for acquittal. *Lee*, 359 F.3d at 418-19.

Nonetheless, there must be substantial evidence on each of the elements of the offense from which a jury could find Schwentker guilty beyond a reasonable doubt. Substantial evidence "must do more than create a suspicion of the existence of the fact to be established." *Hoxie*, 419 F.3d at 482. In this context, substantial evidence is "more than a mere scintilla. It [is] such relevant evidence as a reasonable mind might accept to support a conclusion. It is evidence affording a substantial basis of fact from which the fact in issue can be reasonably inferred." *Orrico*, 599 F.2d at 117.

To prove that Kotula was guilty of the conspiracy alleged in count one, the government did not have to prove that he violated some substantive statute (such as tax evasion). *US v. Douglas*, 398 F.3d 407, 412 (6th Cir. 2005) (citation omitted). Rather, to establish a conspiracy in violation of 18 U.S.C. § 371, the government had to show that (1) two or more people agreed to accomplish an illegal objective against the U.S.; (2) the defendant willfully became a member of the conspiracy; (3) one of the conspirators thereafter knowingly committed at least one overt act at about the time and place alleged in the indictment; and (4) that overt act was knowingly done in furtherance of some object or purpose of the conspiracy. *Beverly*, 369 F.3d at 532.

As to the first element, proof of a formal agreement is not necessary; a "tacit or material understanding among the parties" will suffice. *US v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005) (citation omitted), *cert. denied sub nom. Harris v. US*, – U.S. –, 126 S.Ct. 1603 (2006). The existence of a conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan. *Id.* As to the second and third elements, a

78

defendant's knowledge of and voluntary participation in the conspiracy may be inferred from his conduct and established by circumstantial evidence. *Id.* Once the government establishes a conspiracy beyond a reasonable doubt, defendant's connection to it need only be "slight." *Id.*

A conspiracy conviction does not require proof that a defendant was an active participant in every phase or aspect of the conspiracy, *Beverly*, 369 F.3d at 532, nor does it require proof that he played more than a minor role in the scheme, so long as he understands the conspiracy's essential nature and intentionally joins it. *US v. Warner*, 690 F.2d 545, 550 (6th Cir. 1982). The defendant need only know of the conspiracy, associate himself with it, and knowingly contribute his efforts towards its furtherance. *Beverly*, 369 F.3d at 532.

Kotula first argues that there was no direct evidence that he conspired with Harris to evade federal taxes, as the district court acknowledged. Specifically, he alleges that there was no evidence that he was an officer or director of any corporation listed in the indictment, that he was a trustee or other officer of any trust except his own, or that he received any economic benefit from the real-estate transactions in the case. Nor was there any evidence that Kotula was involved with the National Coin Exchange, Harris's and Schwentker's offshore bank accounts, or any of Harris's allegedly abusive trusts: "Kotula was simply a property manager collecting rents, repairing buildings, and helping to get a bankrupt amusement park on its feet." Rather, Kotula argues, the government obtained his conviction through speculation, innuendo, and "guilt by association" with Harris and Harris's prior convictions.

After pointing out the lack of direct evidence, Kotula assails the evidence and testimony that the government did present. First, Kotula asserts that the only basis for considering him the CEO of Harris's GH Group was the handwritten organizational chart, introduced as GX 452, with no authentication or showing of relevance and foundation.

Second, in contrast to the claim that he was "directly and deeply involved" in Harris's allegedly fraudulent conveyance of the amusement park to a trust, Harris's former attorney, Lawrence Bolla, testified that he had contact with Kotula only with regard to "administrative things" and "cleanup details" for the transaction. Kotula also contests the allegation that he "was deeply involved in Harris's successful efforts to pressure the trustees into a 'settlement'" and drafted the settlement himself. Kotula points again to Gregg's testimony that Kotula was not an officer, shareholder, or trustee of any corporation or trust, did not come up with the idea of conveying the park to a trust, "had no control or independent authority," and merely typed up the settlement after Gregg wrote it by hand on a legal pad.

Third, Kotula argues that, although the government cites four witnesses as testifying that they "considered Kotula to have virtual second-in-command authority regarding the GH Group's legal affairs," none of those witnesses mentioned the GH Group.

Kotula mounts other attacks on specific pieces of evidence, but he does not support any of them by quotation, summary, or discussion of the testimony in question: Agent Hendrickson's testimony does not support the claim that Kotula was CEO of GH Group; Agent Torbic's testimony does not support the claim that Kotula, as CEO, knew about Harris's storage facility; Watson's

testimony did not support the claim that Kotula likely understood the tax-evading purpose of Harris's transfer of the park to a trust; and Kornblau's and Freedman's testimony do not support the claim that Kotula co-mingled assets.

Kotula is correct that the organizational chart showing him as CEO as the GH Group should not be considered, because it was never authenticated and so should not have been admitted. Even without that chart, however, the evidence was sufficient to permit a reasonable jury to find the elements of his conspiring with Harris beyond a reasonable doubt.

Attorney Bolla, who represented Harris in connection with his conveyance of the park to the Trustees of Conneaut Lake Park, testified that Kotula "was Gary [Harris]'s right hand man" and was actively involved in the closing. Although Bolla characterized his contacts with Kotula as dealing with "administrative things," he also said that he "took a lot of directives from Mike Kotula, in terms of what entity was going to buy the park, and what entity was going to own the liquor license, and what entity may operate the park . . . ." *Id.*

Also testifying about Kotula's role in Harris's operations was attorney Watson, who advised Harris of different ways to transfer the park out of his name, created the Trustees of Conneaut Lake Park, and advised him in connection with a mortgage foreclosure dispute and local tax matters involving the park. Watson stated that Kotula was present when Harris signed the paperwork to create the Trustees and convey the park to the Trustees. Watson described Kotula as Harris's "right hand man" and recalled that Kotula "would often be the one communicating or informing me of matters, or relaying matters to Mr. Harris" regarding the park's local taxes, negotiation of the

81

mortgage foreclosure, and other matters involving the park. Significantly, Watson testified that, although Harris said that he was the ultimate decisionmaker, "Mr. Harris had informed me that I could rely upon whatever Mr. Kotula had said."

George Peters, an attorney for the City of Cleveland who had worked full-time as Harris's counsel from 1994-97, also testified. Peters stated that "I would receive instructions from Mr. Harris and from Mike Kotula on different cases or matters that needed to be handled." Peters also recalled that Kotula served as the office and property manager; if Peters had questions, he normally went to Kotula first.

Also testifying was attorney Baker, who represented Harris in real-estate litigation from 1998-2001. Baker "dealt with Mr. Kotula almost exclusively" and regularly communicated with him in person and by phone. Moreover, it was Kotula who usually requested that Baker perform legal work. Significantly, Baker stated that Kotula handled some of the litigation and real estate matters for Harris while Harris was incarcerated. (The government cites the testimony of Emanuel, Harris's former brother-in-law, but that testimony is of little or no utility on this score.)

In the same vein was the testimony of Swift, who worked during the conspiracy period as general manager for Harris's company, Sharp & Fellows. Swift recalled his understanding that Kotula managed Harris's Ohio office, was Swift's "supervisor," and gave Swift "[b]usiness advice, accounting questions, assistance. Requests for checks to make payments on bills . . . . Advisement [sic] on contracts that were larger than average for us."

Agent Hendrickson testified that Kotula served as the intermediary between Harris and Hendrickson as Hendrickson tried to assemble Harris's OBD-500 financial statement.

Whether it is strictly accurate to call Kotula the "CEO" of GH Group, the evidence of Kotula's extensive involvement with Harris's businesses, tax matters, and litigation, and the degree of trust and authority that Harris reposed in Kotula, could support the inference that Kotula was aware of the 1992 IRS search of Harris's home and offices, 1995 tax evasion conviction, 1997 plea to additional tax charges, and the 1999 IRS search of Harris's storage facility.

More telling, the evidence supported the inference that Kotula knew that many of Harris's companies were mere nominal entities that maintained nothing more than bank statements and check registers, used merely to shift funds around for unusual, unexplained, or false purposes and thereby camouflage income ownership and tax liability. *US v. Nwabardi*, 159 F. App'x 547, 551-52 (5th Cir. 2005) ("Irregular business practices or an unexplained deviation from the ordinary course of business can provide circumstantial proof of one's participation in the conspiracy itself.").

The evidence also supports the inference that Kotula was aware of the tax-evading purpose animating Harris's transfer of the park to the Trustees. *See US v. Bieganowski*, 313 F.3d 264, 277-78 (5th Cir. 2002) (emphasizing that defendant was the de facto manager of coconspirator's business, in which fraudulent practices were widespread and not kept secret from those on the inside).

To convict Kotula for tax evasion in violation of 26 U.S.C. § 7201, the government had to prove beyond a reasonable doubt that (1) there was a tax deficiency, i.e. a tax due and owing by

Kotula, (2) Kotula committed an affirmative act of evasion or attempted evasion of that tax, and (3) Kotula willfully violated the tax law. *US v. Benson*, 79 F. App'x 813, 824 (6th Cir. 2003).

The evidence against Kotula on the tax-evasion count is not overwhelming, either in absolute terms or compared to the conspiracy evidence against him. But it is sufficient to support his tax-evasion conviction under the very deferential standard for reviewing jury verdicts.

In 1998, Kotula sold his own land to Ashtabula County, Ohio for $425,000. The sale contract recited that Kotula was selling the land to avoid eminent domain. Kotula made a $382,000 profit on the sale, on which he owed federal income tax of $82,000. The parties agree that Kotula did not list the profit on his 1998 federal income tax return.

The government charged that Kotula's failure to report the land-sale gain in that year constituted willful attempted evasion. Kotula's defense is that 26 U.S.C. § 1033 allows a taxpayer to defer gain from a sale made under threat of eminent domain if they use the proceeds to buy replacement property within a certain period of time. As Agent Fisher testified, if the taxpayer meets the requirements, he is not required to report the gain in the first year following the sale.

The government alleges that "several Ashtabula County officials" testified that the land-sale agreement's references to eminent domain were a "sham," but the government fails to point to particular testimony using that word. The government relies on the testimony of current and former county commissioners that the county never suggested that it was considering using eminent domain to take Kotula's land, that it was Kotula alone who insisted on inserting the eminent-domain language, that the commissioners knew eminent domain was unpopular and so would not use it

lightly, and that the county had probably not used eminent domain in the twenty years prior to the county's purchase of Kotula's land. The government concludes,

> [i]n light of the testimony from the IRS accounting expert and the Ashtabula County officials, the jury had compelling reasons to determine that Kotula concocted a phony paper trail to create the appearance that he qualified for tax deferral under 26 U.S.C. 1033 and thereafter filed a false tax return that understated income and taxes due – a classic form of attempted income tax evasion. The tax evasion motive for Kotula's conduct was self-evident, and therefore his bad-faith insertion of eminent domain language into the paper trail of the real estate transaction, conduct . . . likely . . . to mislead or conceal, plainly qualified as a willful act of evasion. The inference of willfulness was fortified by the evidence of Kotula's sophistication in business administration and accounting.

In response to the allegation that Kotula "inserted" the eminent-domain language into the land-sale agreement, Kotula notes that former County Commissioner Condron testified that he did not know who drafted the agreement, while County Commissioner Boggs testified that the county attorney drafted it.

> Kotula also responds that he conducted the sale and tax compliance openly and properly:

> [T]he prosecutor's contention that Kotula "concocted a phony paper trail" (US Br. at 32) is absurd. None of the documentation relating to the sale was challenged for authenticity or legitimacy. The agreement was signed by the County Commissioners on advice of the County Prosecutor. The extensions to obtain replacement property were authorized and testified to by IRS Agent Listerman. The title work and IRS Form 1099S were testified to by the title company representative who assisted Kotula in finding legal counsel. There was nothing fraudulent or concealing. Everything was conducted in a public forum. No reasonable jury could infer willful intent.

Kotula says there is no evidence that the county advised him that it would not use eminent domain or that it considered the eminent-domain language to be superfluous.

Moreover, the title company reported the gain on Form 1099S, which Kotula signed. *Id.* Kotula emphasizes that he consulted counsel about how to treat the gain, and he contacted IRS Agent Listerman to secure extensions of time in which to buy replacement property. (The three-year period to obtain replacement property did not expire until August 2002, and Kotula began corresponding with the IRS about an extension in April 2002.)

Lastly, Kotula points to the district court's statement that there was no evidence that the sale did not qualify for tax-deferral under 26 U.S.C. § 1033.

On this record, a reasonable factfinder could find that it was not reasonable to fear eminent domain under the circumstances. With or without such a finding, the factfinder could conclude that Kotula did not actually have a good-faith belief (reasonable or otherwise) that his property was threatened by eminent domain so as to trigger the deferred-reporting provision of IRC § 1033.

XX.

Next, Kotula contends that the jury

[i]nstructions relating to Count 5, tax evasion, and the tax deferred exchange were erroneous. . . . . Despite Kotula's request, the jury was not instructed that '[a] sale of property is made under threat of condemnation if the taxpayer has *reasonable grounds* to believe the property eventually will be condemned. [JA] 429. The district court refused to give this instruction and instead instructed that:

> If a taxpayer sells property to the government under threat of or imminence thereof of eminent domain [sic], the taxpayer may defer reporting any capital gains incurred from the sale of that property pursuant to 26, United States Code, Section 1033. Otherwise, any capital gains incurred from the sale of that property must be reported by the taxpayer the same tax year as the sale. [JA] 4193.

86

Kotula points to IRS Revenue Ruling 63-221, which provides that a threat or imminence of eminent domain exists when "the property owner has reasonable grounds to believe . . . that the necessary steps to condemn the property will be instituted if a voluntary sale is not arranged." *See, e.g., Murray v. CIR*, 1965 WL 1112 (Tax Ct. 1965), *aff'd*, 370 F.2d 568 (4th Cir. 1967).

Kotula also references IRS Revenue Ruling 81-180, which states that a sale to someone other than the potential eminent-domain authority also qualifies as a § 1033 deferred exchange if made by a "taxpayer having reasonable grounds to believe the necessary steps to condemn the property eventually would have been instituted . . . ."  (There are no federal decisions on WestLaw that interpret Rev. Ruling 81-180.)

The government cites *Byrum v. US*, 440 F.2d 949, 952 (6th Cir. 1971), *aff'd*, 408 U.S. 125 (1972), for the proposition that Revenue Rulings do not have the force of law, are not entitled to the same deference as a statute or regulation, and may be disregarded if they conflict with the statute they purport to interpret.  But "[r]evenue rulings do . . . constitute precedents to be used in the disposition of other cases.  . . . .  Revenue rulings also serve as official interpretation[s] by the IRS of the tax laws." *Aeroquip-Vickers, Inc. v. CIR*, 347 F.3d 173, 181 (6th Cir. 2004) (internal quotation marks and citation omitted).

We review a properly preserved objection to a jury instruction by determining "whether the charge, taken as a whole, fairly and adequately submits the issues and applicable law to the jury." *Blood*, 435 F.3d at 623.  We may vacate a judgment of conviction due to faulty jury instruction only if the instructions, viewed as a whole, "were confusing, misleading, or prejudicial." *Id.*

Although a jury instruction alleged to be faulty on a question of law is reviewed de novo, "the failure to provide a requested jury instruction, as a matter within the trial court's discretion, is reviewed for abuse of discretion." *Blood*, 435 F.3d at 623 (citation omitted). Harmless errors are disregarded. *Blood*, 435 F.3d at 623 (citing FED. R. CRIM. P. 52(a)).

A district court must instruct the jury on the defendant's theory of the case "'if the theory has some support in the evidence and the law,' but not where the instruction is 'based on speculation.'" *Blood*, 435 F.3d at 623 (quoting *US v. Morgan*, 216 F.3d 557, 566 (6th Cir. 2000)).

We reverse only if the proposed instruction is correct, is not substantially covered by the charge actually given, "and is so important that failure to give it substantially impairs the defense." *Blood*, 435 F.3d at 623-24. Reversal is not warranted whenever reasonable jurors *could have* interpreted the instructions in a way that led them to convict, even though the jurors found that defendants had a good-faith belief that they were complying with the tax laws. "[T]he proper inquiry is not whether the instruction 'could have' been unconstitutionally interpreted, but whether there is a *reasonable likelihood* that the jury did so interpret it . . . ." *Perry*, 438 F.3d at 651 (emphasis added).

Kotula is correct that the instruction given on count five is a prejudicially incomplete statement of the law, but the instruction requested by Kotula is also incomplete. The jury instruction given on count five, tax evasion, did not "fairly and adequately submit[] the issues and applicable law to the jury," *Blood*, 435 F.3d at 623, and Kotula was prejudiced by the error. Following the instruction given, there is a "reasonable likelihood" that the jurors convicted Kotula of tax evasion

88

based solely on their finding that the circumstances did not indicate a threat that the county would

use eminent domain to take his land. In other words, there is a reasonable likelihood that the jury

convicted based on an objective standard.

A proper and complete instruction would include Kotula's emphasis on "reasonable grounds"

to fear eminent domain, but it would not stop there. The district court should have instructed the jury

that the issue is whether Kotula *had a good-faith belief* that there were reasonable grounds to fear

that the county would exercise eminent domain. This may sound cumbersome, but it is the only way

to capture both the Supreme Court's definition of tax-law willfulness and the Revenue Rulings'

reasonable-grounds standard for § 1033 deferral.

Even assuming there was strong evidence that Kotula did *not* have a good-faith belief that

there were reasonable grounds to fear eminent domain,[7] the jury did not know that was the question

---

[7]A court should not give a requested instruction, even if it accurately states the law, if it lacks evidentiary support. *Morgan*, 216 F.3d at 566; *US v. Tandon*, 111 F.3d 482, 490 (6th Cir. 1997). But the government fails to show that the jury *had to* find that a reasonable grounds-to-fear-eminent-domain instruction had no evidentiary support. The government asserts that

> the evidence at trial demonstrated that Kotula did not have a reasonable basis to believe that condemnation of his property was imminent. The testimony relating to Kotula's commercial property sale established beyond question that his buyer, Ashtabula County, had not even hinted at the possible exercise of eminent domain to acquire his property; instead, the County witnesses revealed that the references to eminent domain in the sales contract had been inserted by Kotula, not the County, and that the County had never planned to condemn Kotula's building.

But the testimony cited merely *could* support the conclusion that Kotula did not believe there were reasonable grounds to fear eminent domain; it did not *compel* that conclusion. For example, reasonable jurors are free to find that the commissioners lacked credibility, i.e., that they actually did intend or expect to exercise eminent domain over Kotula's land. Alternately, the jurors could believe

at hand. Therefore, Kotula is entitled to a new trial at which the jury will know what the government must prove to convict him of tax evasion in connection with the land sale.[8]

### XXI.

On the issue of Harris's prior federal tax plea, the district court instructed the jury:

> You have heard some evidence related to Defendant Gary Harris' 1997 plea agreement with the United States of America. This plea agreement in no way prevents the United States from proceeding with the charges alleged in this indictment. You may, however, consider the facts and circumstances surrounding the plea agreement, financial statement [From OBD-500], and income affidavit in evaluating his intent.

Kotula argues that this instruction

> effectively granted judgment for the government on the issue of Kotula's good faith reliance on Harris's plea agreement as having resolved all tax issues for the years 1994 through 1996. The instruction effectively precluded the jury from construing the plea agreement and Kotula's reliance on it as evidence that Kotula was not involved in any conspiracy in regard to the years covered by the plea agreement because of his good faith reliance on the plea agreement as resolving tax issues relating to those years. . . . Since much of the government's case hinged on the alleged false affidavit provided by Harris, the government's conspiracy charge would have been undermined, at least as to Kotula, if the instruction regarding the plea agreement had not been given. Accordingly, [Kotula's] conviction on Count 1 should be reversed.

But Kotula misleadingly quotes only the phrase "This plea agreement in no way prevents the United States from proceeding with the charges alleged in the indictment."

---

the commissioners' testimony that they did not intend or expect to exercise eminent domain, but find that Kotula believed otherwise.

[8]This obviates the need to consider Kotula's other challenges to his tax evasion conviction.

Considering the entire instruction in context, Kotula's argument lacks merit. The instruction sufficiently advised the jury to consider the possibility that Harris believed that his 1997 plea resolved all his federal tax liabilities for the years covered. If the jury so found, it would conclude that Harris lacked the intent to conspire to evade his taxes for those years. The jury then would have to conclude that Kotula could not have conspired with Harris to evade Harris's taxes for those years.

## XXII.

Like Schwentker, Kotula contends that the district court abused its discretion by trying him together with Harris. We reject this argument for the reasons stated in our discussion of Schwentker's severance motion.

## XXIII.

As conceded by the government, Kotula is entitled to be resentenced due to *Booker* error. It would not be appropriate, however, to simply impose the alternative sentence previously announced by the district court. The district court did not sufficiently explain its consideration of the Guidelines and the 18 U.S.C. § 3553(a) factors to enable us to determine whether Kotula's alternative sentence is reasonable. *See Till*, 434 F.3d at 887. Because Kotula is entitled to a new trial on count five (tax evasion) and *Booker* resentencing on count one (conspiracy), we do not address his other assignments of sentencing error.

## XXIV.

For the foregoing reasons, we affirm Kotula's conspiracy conviction but vacate his tax-evasion conviction due to an erroneous jury instruction. Kotula is entitled to a new trial on the tax-evasion charge and to *Booker* resentencing on the conspiracy conviction.

## XXV.

In summary, we affirm Harris's conspiracy and tax-evasion convictions, but we remand for resentencing consistent with *Booker* and with this opinion's interpretation of the tax-loss, relevant-conduct, and obstruction-of-justice guidelines. We affirm Schwentker's conspiracy conviction but remand for resentencing consistent with *Booker*. Lastly, we affirm Kotula's conspiracy conviction but vacate his tax-evasion conviction; we remand for a new trial on Kotula's tax-evasion charge and for resentencing on the conspiracy conviction consistent with *Booker*.